**FRASER CONSTRUCTION CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–435C.

United States Court of Federal Claims.

June 25, 2003.

Marvin T. Fabyanske and Richard G. Jensen, Fabyanske, Westra & Hart, P.A., Minneapolis, Minnesota, for plaintiff.

Michael F. Kiely, with whom were Assistant Attorney General Robert D. McCallum, Jr., Director David M. Cohen, Assistant Director Deborah A. Bynum, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. Edwin C. Bankston, U.S. Army Corps of Engineers, St. Paul, Minnesota, of counsel.

### DECISION ON REMAND

WIESE, Judge.

This contract action is before the court following a trial, held in St. Paul, Minnesota, from April 30 to May 3, 2002, then resuming from October 8 to October 10, 2002.

The contract at issue was awarded to plaintiff, Fraser Construction Company, on February 17, 1993, by the Army Corps of Engineers ("the Corps") for flood control

work involving a section of the South Fork Zumbro River in Rochester, Minnesota, referred to as Silver Lake. Plaintiff began work on the project on May 17, 1993, and the contract was scheduled to be completed by September 1, 1993. During the months of June, July, and August, however, plaintiff experienced adverse weather conditions and high water flows that impeded its progress.

In response to those conditions, plaintiff repeatedly sought both time extensions and additional contract compensation to complete the project. With regard to the time extensions sought for unusually severe weather, the Corps granted 33 of the days sought. With regard to the time extensions based on high water flows, however, the Corps denied all claims. The Corps additionally refused all requests for increased compensation.

Plaintiff brought suit in this court on June 29, 1995, seeking the additional days and funding it had been denied. In a May 12, 1998, decision, the court concluded that the high water flows of which plaintiff had complained did not result in an excusable delay since they constituted neither unusually severe weather nor a flood as those terms were used in the contract's default clause (section I.83). *Fraser Constr. Co. v. United States,* No. 95–435C (Ct.Fed.Cl. May 12, 1998) (granting defendant's motion for summary judgment).

On appeal, the Federal Circuit rejected the trial court's conclusion. *Fraser Constr. Co. v. United States,* No. 98–5136, 1999 WL 507148 (Fed.Cir. July 15, 1999). The court explained that the conditions listed in the contract's default clause were illustrative rather than exclusive and, thus, that unusually high water flows could be found to constitute excusable delay even if they did not fall into the category of either a flood or unusually severe weather. *Fraser,* 1999 WL 507148, *2. The action was therefore remanded to this court for a determination of "whether Fraser established a right to excusable delay under section I.83 based on an unforeseeable rate of water in the river leading to inundation of the lake bed for an extended time during the performance period." *Id.* That determination, in the Federal Circuit's view, rested on three issues to be considered on

remand: (i) whether the high water flows experienced at the project site constituted an excusable delay under section I.83; (ii) whether plaintiff submitted timely requests for relief; and (iii) whether plaintiff's design of its diversion system contributed to or caused the difficulties plaintiff encountered.

After carefully considering the evidence presented, we now conclude that: (i) plaintiff should have anticipated the instantaneous peak flows experienced at the project site based on the available hydrographic data and, thus, cannot rely on high water flows as a basis for an excusable delay; (ii) plaintiff is additionally ineligible for relief since it failed to give the Corps correct information about its dam capacity, a crucial aspect of its claim; and (iii) the Corps, although it frequently expressed concern about the progress of the work, always timely acknowledged and granted the contractor's requests for weather-based time extensions, and thus its actions cannot support a claim of constructive acceleration. Accordingly, we hold that plaintiff is not entitled to recovery in this action.

## FACTS

On December 11, 1992, the Corps issued a solicitation for the dredging and disposal of an estimated 109,000 cubic yards of material from Silver Lake. Although the solicitation did not specify the method by which the project site was to be excavated, it provided for the drawing down of Silver Lake from its normal elevation, no earlier than May 1, 1993, in order to facilitate the dredging.

In response to the solicitation, plaintiff submitted a proposal that called for the construction of a cofferdam to divert the river from its natural course, thereby allowing plaintiff to excavate the material on the land side of the dam "in the dry." Toward that end, plaintiff proposed the use of bulldozers and backhoes to excavate the river-bottom material and trucks to haul the material to the disposal site. In total, plaintiff anticipated a 46–day excavation period, to run from May 31 through August 22, 1993 (including 13 anticipated adverse weather days) with a ten-hour-per-day, five-day work week and a project completion date of September 1, 1993.

The Corps awarded plaintiff the contract on February 17, 1993, for a fixed price of $744,585. Pursuant to the contract schedule, the Corps commenced the drawing down of Silver Lake on May 1, 1993, and plaintiff began work on the project on May 17, 1993. On May 31, just after plaintiff had begun construction of the upstream section of its diversion dam, however, elevated river flows, on the order of 1,320 cubic feet per second (cfs), overtopped the yet-to-be completed diversion system and flooded the work site. As a result, plaintiff spent much of the next two weeks repairing the diversion system, a task made more difficult by sustained high river flows and the saturation of the material used to rebuild the cofferdam.[1] Shortly after plaintiff completed the repair work on its diversion system, however, the project was again inundated, this time by peak flows of 3,170 cfs on June 17 and 3,680 cfs on June 18.

Seeking relief for the flooded site conditions, Rick Penz, plaintiff's president, sought permission to suspend operations until the waters had receded, a request that was orally denied at a June 24, 1993, meeting with the Corps. In a follow-up letter of that same date, Mr. Penz acknowledged that "the peaks of 1320 cfs [on May 31, 1993] and 1610 cfs [on June 8, 1993] were within what has to be considered the usual nature inherent to this site," but went on to note that "the 3680 cfs flow on 6–18–93 (which overtopped our dike by .88 ft) is considered by us to be in excess of what would ordinarily be encountered as determined by a point falling outside the 2000 cfs, 25th percentile on the monthly instantaneous peaks graph provided in the contract documents." Plaintiff accordingly sought an equitable adjustment in both time and money for the extra work resulting from the June 18, 1993, flow.

In a June 28, 1993, response to plaintiff's request, the Corps directed plaintiff to identify, *inter alia*, what it had anticipated by way of flows, how the flows it actually experienced differed from those it had expected, and what damages had resulted. By letter dated July 6, 1993, plaintiff replied that the

normal range for flows were those occurring with more than a 25 percent probability and contended that there was a mere 4 percent chance that flows at the project site would meet or exceed 800 cfs. Plaintiff went on to itemize its damages, including increased labor costs and the costs of additional equipment.

A series of exchanges followed throughout July and August, with plaintiff maintaining that it was due additional time and money for difficulties it encountered at the work site, and with the Corps repeatedly asking for information to support plaintiff's claim. Although three contract modifications were issued over the course of the contract's performance granting plaintiff 33 additional days based on unusually severe weather, no resolution was reached with respect to plaintiff's claims based on high water flows.

With negotiations as to time extensions ongoing, plaintiff made a series of adjustments on-site to address the unusually wet conditions. On June 22, 1993, for example, plaintiff added a dragline to its operations, equipment that would better allow it to excavate "in the wet." Similarly, on June 28, 1993, plaintiff added additional backhoes and made the decision to abandon its dewatering wells since they had proven to be of only limited usefulness. Finally, plaintiff requested and was granted permission to alter its work schedule to a six-day work week, thereby making it eligible for additional time extensions.

With these adjustments in both equipment and scheduling, plaintiff was ultimately able to complete the project in a timely manner. The final cost for the project, however, was almost double the amount plaintiff had anticipated in its bid. Plaintiff now identifies those additional expenses as the cost of accelerating its work and seeks their recovery here.

## DISCUSSION

█ In order to prevail on an acceleration claim, a contractor must prove (i) that there

---

1. On May 27, 1993, the river's flow averaged 321 cfs. Following the May 31 overtopping of plaintiff's partially completed dam, and while the repair and rebuilding of the dam was underway, average river flows ranged from a low of 402 cfs to a high of 1,320 cfs. The record does not reveal what changes in river depth accompanied these changes in average flows.

was an excusable delay, (ii) that a timely extension was sought, (iii) that the government failed to respond or responded belatedly, and (iv) that the contractor was forced to accelerate its work as a result. *Norair Eng'g Corp. v. United States*, 229 Ct.Cl. 160, 666 F.2d 546, 548–50 (1981). Plaintiff claims that it was required to work on days for which it was later given weather-based time extensions and also on days for which it should have been granted, but was denied, time extensions based on high water flows. Such an acceleration of work, plaintiff contends, resulted in increased costs totaling $576,095.61 for which it now seeks payment.

Defendant denies plaintiff's claims. In defendant's view, all of the difficulties plaintiff encountered during the project were of its own making, a result of a construction plan that was unduly sensitive to the hydrological conditions at the site and a diversion system that was inadequate to avoid repeated overtopping. Nor, defendant contends, were the water flows plaintiff experienced during the contract period greater than those that should have been anticipated based on the available hydrographic data. Any additional costs and effort expended by plaintiff, defendant therefore concludes, were necessitated not by a constructive acceleration on the part of the government, but rather by the weaknesses in plaintiff's chosen method of construction.

## I.

■ The contract's default clause, section I.83, under which plaintiff seeks relief,[2] absolves the contractor of responsibility for any delays in contract completion that arise "from unforeseeable causes beyond the control and without the fault or negligence of the Contractor ...." Thus, in determining whether plaintiff's delays based on high water flows constitute excusable delays, the court must assess the risk plaintiff faced and determine whether plaintiff identified and adequately guarded against all reasonably foreseeable impediments to its chosen method of construction. Such an inquiry, then, must focus on whether the flow rates experienced at the work site could reasonably have been anticipated from the historical data regarding flow rates and whether plaintiff's diversion system was in turn built to an elevation sufficient to withstand those flows and avoid inundation of the work site.

In support of its contention that the flows experienced at the work site were not ones it should have anticipated or been required to guard against, plaintiff offered an array of statistics designed to highlight the extraordinary nature of the conditions it encountered. It was undisputed, for instance, that the amount of water running through the Silver Lake basin during the summer of 1993 was greater than at any other time during the previous forty-one years.[3] Similarly, the summer of 1993 proved record-setting for the frequency with which high water conditions were experienced. In the 41 prior years of record, for instance, daily mean flows for the month of June exceeded 800 cfs only 5 percent of the time; in June 1993, by contrast, flows exceeded 800 cfs 40 percent of the time (eight times as often). There were 23 days during the summer of 1993, in fact, when the daily mean flow exceeded 800 cfs, far greater than any other year of record.

2. Although defendant maintains that the contract's unusually severe weather clause, section F.4, rather than the default clause governs plaintiff's claim, we see no reason to resort to the severe weather clause in the evaluation of this suit. In its decision remanding the case, the Federal Circuit was clear that it considered any recovery available to plaintiff to fall within the province of section I.83 and ruled that high water flows could provide the grounds for an excusable delay even though they constituted neither a flood nor unusually severe weather. Indeed, as a practical matter, the relief available under the two clauses is identical: each offers the contractor additional time but neither offers additional compensation.

3. Plaintiff's expert Dr. Lawrence Woodbury testified that 1993 was "the wettest year of record for a three-month period over the whole record dating back to 1952." The daily mean flow for the years 1952 to 1992, for example, was 171 cfs; for the summer of 1993, the daily mean flow was almost five times greater, or 707 cfs. The summer of 1993 thus witnessed a water flow that represented a 75–year event, *i.e.*, an event that could only be expected to occur every 75 years. Even the contracting officer's representative Leon Mucha conceded that for that "narrow" parameter (*i.e.*, the average flow volume), the summer of 1993 was "well above normal."

Taken together, the statistics indeed seem to reveal a pattern of water flows that were unusually high. While plaintiff makes a clear case for the proposition that the daily river flows were, on average, greater in volume for a longer period than at virtually any other point in the prior years of record, that data reveals virtually nothing about the instantaneous peak flows experienced at the site. Yet, it is clear from the testimony of plaintiff's own experts that it was instantaneous peak flows and their subsequent overtopping of the dam, and not the high daily mean flows, that were the genesis of most, if not all, of the difficulties of which plaintiff had complained.

Plaintiff's expert in geotechnical engineering, Gary Arman, acknowledged, for instance, that he did not regard flow duration, *i.e.*, high daily mean flows, as the main cause of any of the events that flooded the project: "I do not believe that . . . the high flows of long duration caused the ultimate failure. I think they caused significant problems to the construction, but it's my understanding that the levee breaching was a result of overtopping, not of high, long flows." Similarly, plaintiff's second expert, Dr. Lawrence Woodbury, a civil engineer and hydrologist with expertise in water diversion systems, testified that "overtopping . . . is a very destructive type of event, so that [it] would receive the highest priority [among the factors contributing to the diversion dam's failure]."

The testimony from plaintiff's experts indeed comports with the court's orientation to the problem. The evidence demonstrates that the flooding of the work site occurred when plaintiff's diversion system was overtopped by instantaneous peak flows, and that high daily mean flows were at no point re-sponsible for the breaching of the dam (*e.g.*, though scouring). Although the prolonged high average flows may indeed have caused difficulties in repairing the diversion system, the fact remains that those residual problems would have been avoided had the dam not been overtopped in the first instance. It is the instantaneous peak flows, then, and not the daily mean flows, upon which the court must focus.

As noted above, in our initial opinion regarding liability, we ruled against plaintiff on the ground that the instantaneous peak flows experienced at the work site did not constitute a flood and hence did not provide the basis for an excusable delay. The Federal Circuit overturned that decision, however, and ruled that such flows could in fact provide the ground for a time extension. In attempting to identify the flows for which the Corps should have granted relief, however, we are nonetheless bound by the contractual limitation that the delay be occasioned by causes that are "unforeseeable." As to this point, plaintiff has failed to make its case.

At no time during the litigation did plaintiff provide the court with a principled way of determining what level of instantaneous flows should be deemed unforeseeable. To the contrary, the highest peak flow experienced during the contract period, 4,820 cfs, falls well within the two- to ten-year event frequency range that experts for both sides testified represents the industry standard for anticipating risk.[4] Indeed, a flow frequency chart for the years 1951 to 1992 reveals that a flow of 4,500 cfs could be expected to occur with a 20 percent frequency, or every five years, over the period of June, July, and August.[5] An event with such a likelihood of

4. According to the testimony of defendant's expert Daniel J. Reinartz, a two-year event, or one with a 50 percent frequency, corresponds to an instantaneous peak flow of 1,800 cfs for the three-month contract period; a ten-year event, or one with a 10 percent frequency, corresponds to 6,500 cfs.

5. Some confusion arose during the course of the litigation as to the proper period to consider in assessing the likelihood of a particular hydrological event. In working papers associated with plaintiff's contract claim, for instance, a Corps representative concluded that a two-year event for the month of June alone was associated with a peak flow of 800 cfs; defendant's expert Mr. Reinartz testified that a two-year event for the three-month period of June, July, and August was 1,800 cfs; and by letter dated July 15, 1993, the contracting officer's representative Mr. Mucha identified a two-year event for a twelve-month period as 5,600 to 6,900 cfs. The apparent discrepancy among these numbers is explained by the fact that the longer the analysis period, the greater the likelihood of exceeding a particular flow rate. Because plaintiff's contract period was originally intended to run from June through August, however, we think the relevant

occurrence is certainly one that plaintiff should be charged with foreseeing and protecting against. *See United States v. Atwater*, 272 F.3d 511, 513 (7th Cir.2001) (describing probability as the "operational meaning of foreseeability" and quoting Richard A. Epstein, Torts 269 (1999) for the proposition that to say that "an injury is not 'foreseeable' is simply to say that the probability of loss is low.").

Plaintiff's failure to provide convincing proof extends to its argument regarding the Minnesota permitting process. In plaintiff's view, the state of Minnesota's requirement that plaintiff design its diversion system to be overtopped during high peak flows rather than cause out-of-bank flooding prevented plaintiff from constructing a dam sufficient to withstand the flows reasonably to be expected at the work site. Plaintiff offered no testimony as to the exact height limitation imposed by the permitting process, however, nor any evidence that such a limitation would have precluded it from protecting against the flows it experienced. We cannot therefore put any meaningful weight on such inconclusive testimony.

In the absence, then, of evidence that plaintiff was limited by the state of Minnesota in the construction of its diversion system and in light of the fact that the instantaneous peak flows encountered at the site were reasonably foreseeable, we are bound to conclude that plaintiff assumed the risk for the overtopping it experienced. Accordingly, we cannot identify the effects of those overtoppings—the expenditure of additional time, effort, or money—with any action of the government.

## II.

■ Even if we were to conclude, however, that the instantaneous peak flows at the site were indeed unforeseeable or that the restraints imposed on plaintiff by the state of Minnesota lessened plaintiff's obligation to protect against such flows, we could not rule in plaintiff's favor. While the parties now agree that plaintiff's diversion system, as built, likely withstood flows up to 2,500 cfs, plaintiff erroneously maintained throughout both the contract period and the litigation that its dam was constructed to withstand flows of only 800 cfs.[6] That omission, we conclude, is fatal to plaintiff's claim.

It is clear from the record that the Corps based its decisions on whether to grant time extensions largely on the erroneous belief that plaintiff's dam, as built, could only withstand flows of 800 cfs. In granting approval of plaintiff's proposed construction plan, in fact, the Corps noted that the diversion system was not designed to withstand flow amounts anticipated to occur within the contract period and advised plaintiff that "[d]elays due to such flows are not justification for weather-related extension of the contract complete date." Similarly, in a letter dated July 15, 1993, the Corps characterized plaintiff's difficulties as resulting from the failure of its cofferdam when the flow rate increased and pointed out that plaintiff had been warned to take the variations in the river flows into consideration in planning its schedule:

> When Fraser ... notified us that [it] intended to handle the river flows with a diversion system which would handle only nominal increases (to about 800 CFS) in river flows, [the Corps] specifically told you that it would be necessary for Fraser ... to anticipate failure of the diversion system whenever any significant rainfalls were experienced. It was also pointed out that restoration of the diversion system would be [Fraser's] responsibility and that work being held up by the river flows

period for analyzing the frequency is that three-month period.

6. The dam, as originally designed, was intended to withstand instantaneous peak flows of 800 cfs. After the drawing down of Silver Lake, however, plaintiff discovered a natural channel running along one side of the lake bed that allowed plaintiff, by relocating the dam along that channel, to increase the dam's capacity. Inexplicably, however, the parties did not discover until after the submission of plaintiff's final claim that the dam, as thus relocated, could accommodate substantially higher flows than its originally intended location would have allowed.

would not be considered justification for extension of the contract completion date.

Indeed, the notes to contract modification P00003 specifically exclude from consideration as the basis for a time extension "any effect that was solely attributed to the overtopping or inadequacy of the Contractor's diking system."

During oral argument, defendant confirmed that the Corps based its decisions on whether to grant time extensions in part on the erroneous belief that plaintiff's dam as built could only withstand flows of 800 cfs. As late as its final statement of claim on December 28, 1993, in fact, plaintiff still represented that its dam was constructed to withstand flows of 800 cfs. Contracting officer Patricia A. Johnson in turn based her February 2, 1995, denial of plaintiff's claim for an extension of time based on high water flows on that incorrect figure, noting that "[h]ad the Contractor chosen a design parameter pegged to instantaneous flow rates and had it chosen to protect against a flow rate which could be expected to occur once every two years (a 50% chance of occurrence in any given year) he would not have experienced any problems due to overtopping of the dikes." [7]

Because the Corps repeatedly identified the source of the problem as the specific height of plaintiff's dam—in other words, because the dam's capacity proved dispositive in the Corps' denials of plaintiff's claims—the court cannot find fault with a decision based on the contractor's own inaccurate submissions. The fact that the parties did not discover until after the filing of plaintiff's final claim that the dam, as built, was capable of withstanding substantially higher flows than originally anticipated means that the Corps was not given the information it would have required to support the granting of the relief plaintiff sought. We therefore conclude that the Corps' denials of plaintiff's requests for additional time based on high water flows were appropriate and that plain-

tiff is thus ineligible for recovery before this court.

### III.

Although we believe that both the fact that the peak flows were foreseeable and that plaintiff failed adequately to state its claim are enough to defeat plaintiff's bid for recovery, we note a third deficiency in plaintiff's case. Plaintiff contends that its acceleration claim is not limited to the days for which it was denied additional time, but includes costs associated with 29 days for which it was ultimately granted weather-based time extensions but on which it nonetheless continued the contract work. Neither of plaintiff's explanations for this continuation of performance, however, strikes us as compelling.

Plaintiff argues, as an initial matter, that the Corps did not give adequate notice of the time extensions that it intended to allow, thus forcing plaintiff to work on those days for which it was later given time extensions. That argument, however, is meritless on its face: the record contains no indication that the Corps' granting of time extensions was tardy in any way or that the Corps deviated at all from the standard procedures used to grant time extensions. The opposite, in fact, is true: Corps representatives participated in daily discussions with plaintiff about the days to be granted, with confirmation provided in a July 13, 1993, fax reiterating the June weather dates negotiated by the parties; notification on August 5, 1993, outlining the extensions negotiated for July; and notification on September 17, 1993, reiterating the days that had been agreed to for August.

Plaintiff's second argument is equally unavailing. Plaintiff contends that although it was permitted to cease operations at the disposal site on days for which it ultimately received time extensions, the Corps nonetheless specifically directed plaintiff to continue operations at the excavation site, thereby forcing it to incur additional costs and essentially rendering the time extensions meaning-

---

7. The contracting officer's identification of the instantaneous peak flow that could be expected to occur every two years is a reference to a peak flow determined on the basis of a twelve-month observation period rather than a three-month period. That instantaneous peak flow (a 50 percent frequency of occurrence) equates to a peak flow of 4,000 cfs at the work site.

less. In support of this proposition, plaintiff points to various exhortations by the Corps that plaintiff not fall behind its contract schedule.[8]

We do not, however, read the Corps' repeated emphasis on adherence to the contract schedule as a constructive notice to accelerate. As an initial matter, the Corps specifically informed plaintiff at a July 19, 1993, meeting that there would be no acceleration unless it was formally ordered, and that the Corps' actions to date had not constituted an acceleration. In light of such a pronouncement, we are reluctant to construe legitimate concerns by the Corps that plaintiff adhere to its original schedule (or else be subject to default) as an indication that the contractor's obligations had increased. The evidence in fact demonstrates that conditions inherent to the site—specifically, the composition of the material in the lake bed—were responsible for impeding plaintiff's progress.[9] With such a built-in hindrance to the timely

accomplishment of the work, the Corps was correct to be concerned.

The greater difficulty with plaintiff's argument, however, is that plaintiff has already received exactly what it now seeks: time extensions for the days in question. Because plaintiff was not eligible for additional compensation, it could only hope to extend the contract schedule to account for the time lost as a result of problems encountered at the site. The fact that the Corps granted time extensions on the basis of delays experienced at the disposal site rather than delays at the excavation site is irrelevant: having received an extension for a particular day, plaintiff would have thereby exhausted the full extent of its relief under the contract.

*Conclusion*

For the reasons stated above, the court concludes that plaintiff is not entitled to any additional compensation. Accordingly, the

---

8. For example, on June 28, 1993, immediately following a meeting to discuss the challenges plaintiff faced, the Corps sent a letter to plaintiff, with a copy to plaintiff's bonding company, expressing concern that plaintiff had fallen behind schedule and advising plaintiff that a failure to prosecute the work with diligence would result in termination of the contract. The Corps advised plaintiff as follows:

> Several concerns have surfaced regarding the construction progress schedule for Stage 1B–2 of the Rochester Flood Control Project. The first concern is the small amount of excavation completed to-date on the project. Your approved schedule allowed only 46 working days for the performance of the excavation. After allowance for anticipated adverse weather days, about twenty-percent of the scheduled time has passed but less than ten-percent of the work is completed. The urgency of schedule compliance has appropriately been emphasized on this project due to the consequences if the work is not complete when the lake drawdown period ends and the lake level is reestablished.

Similarly, in a letter dated July 15, 1993, the Corps reminded plaintiff that it was "solely responsible to prosecute the work in a manner which achieves satisfactory completion by the contract completion date of 01 September or approved extension thereof." Four days later, on July 19, 1993, the Corps additionally informed plaintiff that approximately "18 of the 46 working days, included in [plaintiff's] original schedule (39%) for the excavation and hauling operations, have been completed after allowance

for the weather conditions experienced. However, Fraser ... indicated that only about 22% of the project is completed. This indicates that Fraser ... is significantly behind their submittal schedule."

The daily log prepared by plaintiff's project manager, Steve Nelson, reflects a similar emphasis by the Corps on adherence to the schedule, notwithstanding the high water flows experienced at the site. The June 9, 1993, entry, for instance, contains the notation "flooded" and "water still rising" but observes that Sheldon Edd, the alternate contracting officer's representative, refused to grant relief even though plaintiff had been "impacted all but 2 days since 6/1/93." Similarly, on July 13, 1993, after plaintiff had ceased its operations as a result of wet conditions, Mr. Edd is quoted in the daily log as prompting the contractor: "why weren't you working?"

9. Dr. Mark S. Meyers, defendants' expert in geotechnical engineering, testified that the high moisture content of the excavated materials and their location at the bottom of the lake bed would have necessitated a lengthy period for drying out even in the absence of an overtopping. Dr. Meyers thus concluded that a contractor "attempting to move or excavate these materials using dozers or excavators ... would have a very difficult time." That conclusion is further supported by the fact that plaintiff recognized the need for a dragline (allowing it better to excavate in the wet) as early as June 11, 1993, before any of the overtopping occurred.

Clerk is directed to enter judgment dismissing plaintiff's complaint. No costs.