**FRASER CONSTRUCTION COMPANY, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 03–5155.**

United States Court of Appeals, Federal Circuit.

Sept. 27, 2004.

Richard G. Jensen, Fabyanske, Westra & Hart, P.A., of Minneapolis, MN, argued for plaintiff-appellant. With him on the brief was Marvin T. Fabyanske.

Thomas B. Fatouros, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Deborah A. Bynum, Assistant Director, and James M. Meister, Trial Attorney.

Before NEWMAN, MICHEL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In this government contract case, the contractor seeks damages based on a claim of constructive acceleration. Following a trial, the Court of Federal Claims ruled that the contractor had failed to prove that the government constructively accelerated its performance. *Fraser Const. Co. v. United States*, 57 Fed. Cl. 56 (2003). Because the trial court's decision is based on factual findings that have not been shown to be clearly erroneous, we affirm.

I

In 1993, the Army Corps of Engineers was engaged in a flood control project on the South Fork Zumbro River in Rochester, Minnesota. In connection with the project, the Corps contracted with Fraser Construction Company to excavate material from the bottom of Silver Lake, a shallow reservoir located along the river. The price of the contract was $744,585. The project was scheduled to begin on May 17, 1993, and to be completed by September 1 of that year. Before the project began, the water level in the lake was to be lowered by approximately eight feet to facilitate excavation of the lake bottom. At that water elevation most of the lake would normally be dry, except for a small stream running through the lakebed.

Fraser intended to divert the stream into a trench along the edge of the dry lakebed and to construct an earthen dike to confine the water to the trench. The dike was originally designed to withstand a water flow rate of 800 cubic feet per second ("cfs"). That rate of water flow was substantially higher than the average flow rate for Silver Lake, although the flow rate varied considerably and would occasionally reach much higher levels. The evidence at trial showed that a water flow in excess of the flow the dike was designed to handle could destroy the dike and flood the lakebed. According to statistics from the U.S. Geological Survey, a water flow of more than 800 cfs could be expected to occur, on average, approximately 2.4 times per year during the months of June, July, and August.

In comments accompanying the acceptance of Fraser's construction progress schedule, in which Fraser described its plan for conducting the work, the Corps pointed out that the diversion system Fraser had selected "will be susceptible to damage by flow amounts which are anticipated to occur during the May to August time frame. Delays due to such flows are not justification for weather-related extension of the contract completion date."

The Corps' concerns turned out to be well founded. Because of wet weather in the region, Silver Lake began to experience high water flows shortly after the project started. On May 31, 1993, before Fraser's diversion dike was completed, the flow rate reached 1,320 cfs, which damaged the dike and flooded the work site. Fraser spent much of the next two weeks repairing the dike, work that Fraser asserts was made more difficult than anticipated because high water flows continued through that period, rather than receding as Fraser had expected. After the dike was repaired, excavation work resumed, but between June 17 and June 25 the project was again flooded, with the peak flow rate reaching 4,820 cfs. The mean daily flow rate for that time period was twice as high as was considered normal. Recurrent high water flows continued during July and into August.

The contract between Fraser and the Corps specified that severe weather would be a ground for a time extension. On June 17, 1993, Steve Nelson, Fraser's project manager, made a request to Sheldon Edd, the government's contracting officer, for a time extension based on weather conditions and high water flows. Mr. Edd dealt with (and for the most part informally granted) weather-related extensions immediately; however, Mr. Edd stated that he would deal at a later date with time-extension requests based solely on high water flow conditions.

On June 24, 1993, Fraser's president, Rick Penz, submitted Fraser's first written request for an adjustment in time and money based on the high water flows. In the letter, Mr. Penz stated that the excavation site became flooded as a result of high water flows on May 31, June 8, and June 18. He stated that it was Fraser's position that the flow rates on the first two occasions "were within what has to be considered the usual nature inherent to this site and we do not request an equitable adjustment for the extra work involved as a result of those flows." With respect to the June 18 event, however, he said that Fraser considered the flow rate on that occasion to be high enough to justify an adjustment in time and dollar amount for the contract. In the June 24 letter, Mr. Penz characterized the high flow problem as a differing site condition.

The Corps replied to the June 24 letter four days later, asking Fraser to provide further information regarding the request, such as what Fraser had anticipated about the site, what was different about the site, and how Fraser was damaged. That same day, the Corps sent Fraser a letter demanding that the company improve its progress and threatening to terminate the contract due to delays in the project. A copy of that letter was sent to Fraser's bonding company. The government contends that the letter was sent not only because the project was significantly behind schedule, but also because Fraser's subcontractor had refused to haul away the soil excavated from the lakebed due to the subcontractor's concern that the soil contained contaminated material.

On June 30, Fraser sent the Corps a revised completion schedule in which it took the position that, up to that point, 12 of the scheduled work days had been affected by weather and "the effects of extreme conditions." Assuming a 12–day extension, Fraser contended it was still on schedule to complete the work within the contract period as extended. Fraser explained that it intended to use a drag line so as to continue excavating materials even while the lakebed was wet.

Mr. Edd and Mr. Nelson met on July 7 to negotiate extensions for weather-affected days. According to Mr. Nelson's notes, Mr. Edd stated at that time that the Corps would not recognize extensions based on high water conditions in the Zumbro River, as the Corps considered it to be Fraser's responsibility to ensure that the lakebed did not become inundated. A week later, Mr. Nelson advised Mr. Edd that the excavation site had been flooded again, and Mr. Edd replied that Fraser should have anticipated the conditions and had to continue working.

On July 15, Leon Mucha, a Corps representative, responded by letter to Fraser's June 24 request for a price adjustment in the contract. He denied the request on the ground that Fraser should have anticipated the risk that the dike would be destroyed based on the frequency of peak flows high enough to overtop the dike.

Mr. Mucha's letter referred to the Corps' earlier statement that Fraser should anticipate failure of its dike in the event of significant rainfall, that restoration of the diversion system was Fraser's responsibility, and that delays caused by river flows "would not be considered justification for extension of the contract completion date." Nonetheless, the parties agreed on a modification to the contract for weather-affected days in which the completion date was extended by 15 calendar days. The 15–day extension was granted based on a finding that there were 13 work days in June (based on a five-day work week) on which, because of adverse weather conditions, work was not feasible at the disposal site.

In a July 19 meeting with Corps representatives, Fraser for the first time asserted a claim of constructive acceleration in addition to its claim of a differing site condition. Fraser contended that extensions granted after the fact were not sufficient to compensate the company for the extra expenses it had incurred in dealing with the high water flows, because upon being told that it would not receive time extensions for days of high flow or that those extensions would be dealt with at a later time, it was forced to continue operations at a substantial additional cost.

In response to the oral claim of constructive acceleration, the Corps advised Fraser that it had not accelerated the contract. The Corps added that although it was required to grant time extensions for weather-related high flow conditions, it was not required to grant monetary relief for such conditions.

On July 22, Mr. Mucha requested a revised schedule for completing the work. Mr. Penz replied on July 28 with a revised schedule that incorporated six "rainout" days in July. The following day, Fraser again contended that it had encountered abnormal weather and noted that it was continuing to press its claims of differing site condition and constructive acceleration. Fraser again requested "an additional time extension" but did not specify how much additional time was warranted. In response, the Corps asked Fraser to specify the time periods for which it believed it was entitled to an extension and the reasons it believed there had been government acceleration.

In its response to the Corps' request for information, Fraser replied that the "extremely adverse weather conditions that we have encountered this year have [led] to severe delays and completely unforeseen working conditions. We believe we are entitled to equitable adjustments of both our contract sum and our contract time.... You do not believe you have to pay us any more money, and you have made an offer of a few days' time extension to compensate us for our delays.... We also believe that your refusal to grant us appropriate time extensions, your complaints about our progress and threats to terminate our contract on account of our progress constitutes constructive acceleration."

During August, the parties negotiated a further time extension for weather-affected days in July. As a result of the negotiations, the contract was modified to extend the completion date to September 25. The Corps explained that it had agreed to re-open the adverse weather days for June for renegotiation. The Corps then agreed to all of Fraser's claims for weather-affected days except for June 5, which the Corps said "was an affected date only because the original excavation cofferdam was not adequate nor according to the submitted

plan, and it was over topped, creating a wet excavation site." According to the Corps, Mr. Nelson agreed to exclude June 5 from the weather-affected days. The Corps explained that the criteria it used for calculating adverse weather delays "included the day of a rain as well as any period after that rain when the ... disposal area was too wet and muddy for the trucks to dump or if the material in the lake excavation was too wet or muddy for excavation or hauling as a direct result of the rain and excluded any effect that was solely attributed to the over-topping or inadequacy of the contractor's diking system."

In an August 27 letter, Fraser contended that the extensions for weather-affected days were not sufficient to resolve its constructive acceleration claim. Fraser explained that "when high water flows persisted for days, with our temporary dikes overtopped, you gave us no time extensions unless it happened to be raining or it was physically impossible to dump at [the disposal site]. When the water subsided, but it was still too wet to work, you gave us no time extensions, unless it happened to be raining.... Because of your threats of termination and consistent demands, we have worked almost continuously this summer. What we should have done is simply shut down the entire operation until the waters receded to levels that were more nearly normal."

In late September, the parties agreed upon a further modification of the contract, which extended the completion date to October 1, 1993, based on an adjustment for days of severe weather in August. Once again, the Corps explained that extensions were granted for days of rain as well as any periods after a rain when the disposal area "was too wet and muddy for the trucks to dump or if the material in the lake excavation was too wet or muddy for excavation or hauling as a direct result of the rain and excluded any effect that was solely attributed to the overtopping or inadequacy of the Contractor's diking system."

On September 15, Fraser sent the Corps another letter summarizing its position regarding constructive acceleration. Fraser contended that when the heavy rains and high water came, the Corps had given Fraser "only a minimal number of days of time extension and then only for direct downtime during and immediately after a rainfall. You gave us no allowance whatsoever for high water or high flow problems. Because you were not granting us time extensions equal to the actual delays we were enduring, we had no choice except to accelerate our work and attempt to work under circumstances where we should simply have shut down."

After completing the contract, Fraser submitted its claim of constructive acceleration to the contracting officer. Fraser contended the denial of reasonable extensions for high water flow conditions during the contract period entitled it to an additional $659,760 over the contract price. According to Fraser, the "consistently high water flow caused repeated flooding of the excavation area. Because the Corps forced us to work through the flooding, we were never able to implement our original excavation plan.... Also, the consistently high water levels made the site impossible to dewater effectively. Without dewatering, we incurred substantially increased costs working at the site and handling the excavated material."

The contracting officer denied Fraser's claim on February 2, 1995. The contracting officer noted that Fraser had declined to

identify the specific days for which it believed additional time extensions should have been granted, and that instead Fraser had relied on its general contention that it had been "forced to work through flood conditions." The contracting officer, however, found that the conditions at the work site did not constitute a flood, and that Fraser therefore was not entitled to any contract extension beyond the 30 days of additional time granted in the four agreed-upon contract modifications. With respect to the inundation of the work site, the contracting officer observed that if Fraser had designed its dike to protect against foreseeable peak flow rates, it "would not have experienced any problems due to overtopping of the dikes."

Fraser subsequently filed this action in the Court of Federal Claims. The trial court initially granted summary judgment in favor of the government on three grounds: (1) the contract did not recognize a right to an extension based on high water flows alone, but only for unusually severe weather; (2) Fraser was granted all the extensions of time it sought and was not otherwise accelerated; and (3) Fraser was negligent in the design of its dike, and for that reason Fraser was not entitled to time extensions attributable to high water flows. On appeal, we reversed the grant of summary judgment and remanded the case for trial. We held that the contract's time extension clause was broad enough to cover high flow conditions. We also held that there were genuine issues of material fact with respect to the granting of time extensions and whether Fraser's problems were attributable to inadequacies in the design of its dike. *Fraser Constr. Co. v. United States*, No. 98–5136, 1999 WL 507148 (Fed.Cir. July 15, 1999).

Following an eight-day trial, the trial court ruled that Fraser had not established the government's liability based on constructive acceleration. The court first found that Fraser should have anticipated high peak flows of the sort that occurred during the summer of 1993 and should have anticipated that its dike would be overtopped and damaged; delays resulting from poor dike design, the court concluded, were not excusable. Second, the court found that Fraser had inaccurately advised the Corps that its dike had a capacity of only 800 cfs (when its capacity was actually significantly greater); according to the court, because the Corps was given inaccurate information as to the capacity of the dike it was reasonable for the Corps to conclude that the destruction of the dike was foreseeable and thus was the cause of the inundation of the work site. Third, the court rejected Fraser's arguments that the time extensions the Corps granted were not granted on a timely basis and that the Corps' emphasis on the need for Fraser to adhere to the contract schedule constituted a constructive notice to accelerate. The time extensions that Fraser received, the court found, "exhausted the full extent of its relief under the contract." From that ruling, Fraser took this appeal.

## II

A claim of acceleration is a claim for the increased costs that result when the government requires the contractor to complete its performance in less time than was permitted under the contract. The claim arises under the changes clause of a contract; the basis for the claim is that the government has modified the contract by shortening the time for performance, either expressly (in the case of actual acceleration) or implicitly through its conduct (in the case of constructive acceleration), and that under the changes clause the

government is required to compensate the contractor for the additional costs incurred in effecting the change. *See* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 450–51 (3d ed.1995).

■ A claim of constructive acceleration ordinarily arises when the government requires the contractor to adhere to the original performance deadline set forth in the contract even though the contract provides the contractor with periods of excusable delay that entitle the contractor to a longer performance period. Although different formulations have been used in setting forth the elements of constructive acceleration, the requirements are generally described to include the following elements, each of which must be proved by the contractor: (1) that the contractor encountered a delay that is excusable under the contract; (2) that the contractor made a timely and sufficient request for an extension of the contract schedule; (3) that the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) that the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) that the contractor was required to expend extra resources to compensate for the lost time and remain on schedule. *See Norair Eng'g Corp. v. United States,* 229 Ct.Cl. 160, 666 F.2d 546, 548 (1981) (compressing these five requirements into three essential elements—excusable delay, an order to accelerate, and acceleration with at-

tendant costs); *R.J. Lanthier Co.,* 04–1 B.C.A. (CCH) ¶ 32,481, at 160,688, 2003 WL 22953681 (A.S.B.C.A.2003); *Commercial Contractors Equip., Inc.,* 03–2 B.C.A. (CCH) ¶ 32,381, at 160,261–62, 2003 WL 22232953 (A.S.B.C.A.2003); *Hemphill Contracting Co.,* 94–1 B.C.A. (CCH) ¶ 26,-491, at 131,853, 1993 WL 476309 (Eng. B.C.A.1993); *McNutt Constr. Co.,* 85–3 B.C.A. (CCH) ¶ 18,397, at 92,279, 1985 WL 17278 (Eng. B.C.A.1985); Cibinic & Nash, *supra,* at 450–61.

A

The trial court held that Fraser failed to prove several of the elements necessary to establish constructive acceleration. First, the court held that Fraser failed to prove that the problems it encountered arose from "unforeseeable causes beyond the control and without the fault or negligence of the Contractor," within the meaning of the default clause of the contract. With respect to that issue, Fraser concedes that it was foreseeable that during the performance period there would be peak flows on the river that would result in overtopping its dike, and that each overtopping event would likely require that the dike be rebuilt. Fraser contends, however, that it was unforeseeable (and that it was beyond Fraser's control and not the result of its fault or negligence) that water levels would remain high for days, causing inundation of the work site for lengthy periods. Instead, Fraser argues, it was reasonable to expect that following each high peak flow the water would recede quickly and that Fraser would be able to resume working in dry conditions.

Fraser's argument, in essence, is that although the high water conditions it experienced at the work site were causally related to the repeated overtopping of its

dike, and although it is responsible for the direct, foreseeable consequences of the overtopping of its dike, it should not be held responsible for the continued high water conditions that prevailed for days after each overtopping. Those conditions, Fraser argues, lasted much longer than could reasonably have been foreseen and therefore should have been treated as grounds for excusable delay. The trial court rejected Fraser's argument, holding that because it was foreseeable that Fraser's dike would be overtopped several times during the summer of 1993, Fraser assumed the risk that the effects of those foreseeable overtoppings—including the inundation of the worksite for lengthy periods and the difficulties resulting from the wet worksite—did not provide Fraser with a contractual basis for claiming an entitlement to a period of excusable delay extending throughout the summer. Thus, under the trial court's analysis, even though there were abnormally high average daily water flows in the Zumbro River throughout much of the summer of 1993, those high flow levels did not constitute an independent basis for excusable delay, because if Fraser had constructed its dike system to survive foreseeable peak flow events, the high average daily flows would have been contained and would not have presented problems for the excavation project.

The question whether the high water levels following periods of high peak flows were "unforeseeable causes beyond the control and without the fault or negligence of the contractor," within the meaning of the default clause, is a difficult one. There is no question that the high peak flows were foreseeable and that they were, as

the trial court stated, "the genesis of most, if not all, of [Fraser's] difficulties." That does not mean, however, that Fraser is necessarily chargeable with all events that are traceable to the overtopping of the dike, including unforeseeable levels of high water during extended periods following the overtopping and destruction of the dike. We need not decide whether high water conditions during the performance period could provide a separate basis for time extensions under any circumstances, however, because we conclude that the court did not commit clear error in finding that, even apart from the foreseeability of the high water conditions, Fraser's proof of constructive acceleration failed in other regards and thus it did not prove that it was entitled to compensation for constructive acceleration under the circumstances of this case.[1]

### B

The Corps granted time extensions totaling 30 calendar days to Fraser during the course of the project. In order to prevail on its claim of constructive acceleration, Fraser was required to prove that the delays it encountered were not adequately remedied by the 30 additional days it received. Fraser makes several arguments in support of its contention that the 30–day extension was inadequate: (1) that the various extensions granted during the course of the contract were not granted on a timely basis and therefore were of no use to Fraser; (2) that Fraser was entitled to suspend performance during the entire summer of 1993 and that it was not required to identify particular days on which it was entitled to receive an extension but

---

1. In light of the ground of our decision in this case, it is also unnecessary to address the trial court's finding that Fraser did not provide the Corps with accurate information regarding the capacity of its dike.

did not; and (3) that the Corps forced Fraser to continue working despite the high water conditions, thus compelling it to accelerate its performance. The trial court found against Fraser on each of those points.

### 1. *Timeliness of the Extensions*

Constructive acceleration can be found if the government demands prompt performance while simultaneously denying extensions for excusable delays or granting them only belatedly. *See Norair*, 666 F.2d at 549 ("Where the Government refuses (for whatever reason) to tell the contractor until the end of the project just what delay is excusable and what is not, the contractor is under considerable additional pressure to accede to a request because it does not know whether it will be found liable for liquidated damages.").

■ Grants of time extensions, however, need not be immediate. "Constructive acceleration requires that the government be afforded an opportunity to grant or deny a time extension on account of the delay." *Greulich, Inc.*, 78–2 B.C.A. (CCH) ¶ 13,417, at 65,588, 1978 WL 2237 (Eng. B.C.A. 1978). "[M]ere failure to grant an extension at the time will not constitute a constructive order to accelerate." *Norair*, 666 F.2d at 549. In *McNutt Construction Co.*, 85–3 B.C.A. (CCH) ¶ 18,397, at 92,279 (Eng. B.C.A.1985), for example, a time extension was sought on June 6 and granted on August 28. The Board of Contract Appeals held that in the absence of evidence to the contrary, there was no reason that such an interval was an unreasonable amount of time. *See also McKenzie Eng'g Co.*, 02–2 B.C.A. (CCH) ¶ 31,972, at 157,925, 2002 WL 2005726 (A.S.B.C.A.2002).

■ Fraser argues that many of the time extensions that it was ultimately granted were of no use to it because the extensions were not granted on a timely basis. The trial court, however, found against Fraser on that issue. According to the court, the record "contains no indication that the Corps' granting of time extensions was tardy in any way or that the Corps deviated at all from the standard procedures used to grant time extensions." To the contrary, the court found that "Corps representatives participated in daily discussions with [Fraser] about the days to be granted," and that the days of each month for which the parties agreed to weather-related extensions were incorporated in contract modifications issued within a reasonable period after the conclusion of that month's work.

As the trial court noted, and as the Court of Claims and the Boards of Contract Appeals have observed in other cases, it is not unusual for parties to negotiate after the fact as to the number of extra days that are justified under a contract and to incorporate the extensions in contract modifications issued weeks after the fact. *See Olin Mathieson Chem. Corp. v. United States*, 179 Ct.Cl. 368 (1967); *McNutt Constr. Co.*, 85–3 B.C.A. (CCH) ¶ 18,397, at 92,297 (Eng. B.C.A.1985); *Fermont Div., Dynamics Corp. of Am.*, 75–1 B.C.A. (CCH) ¶ 11,139, at 52,997, 1975 WL 1651 (A.S.B.C.A.1975), *aff'd*, 216 Ct.Cl. 448 (1978).

Fraser points to evidence that on several occasions the Corps' representatives urged Fraser to work despite adverse conditions, and that Fraser worked on a number of days for which it was later granted extensions. Of course, any delay at all in determining whether a particular day will qualify for an extension under the contract will force the contractor to make a judgment as to whether to work in spite of the

conditions or cease working in the expectation that an extension will later be granted. That dilemma is inherent in any case in which extensions are not granted on the spot, before work begins on a particular day. With respect to the evidence that the Corps' representatives stated that they did not recognize high water conditions as a basis for time extensions and pressured Fraser to work in spite of the high water, the Corps' position on that issue was qualified by its expression of willingness to consider granting extensions for days of "weather-related high flow conditions." In addition, it became clear at least as early as mid-July, when the Corps granted a 15-day extension for the month of June, that the Corps would ultimately grant extensions for many of the days as to which Fraser claimed a right to an extension. Although a trier of fact could have made a different finding on the issue of the timeliness of the extensions based on the evidence at trial, Fraser has not persuaded us that the trial court's findings on that issue are clearly erroneous.

### 2. Entitlement to Long–Term Suspension

█ Fraser's position is not that there were particular, identifiable days for which it was entitled to an extension of the contract completion date; instead, Fraser contends that the project should have been shut down during the entire period of June, July, and early August while the mean daily water flow rates were high. Although Fraser makes a compelling case that completing the project was more difficult than it would have been in the absence

of the high water flows, that is not sufficient to show it was entitled to an extension based on high water flows for the entire period between early June and mid-August of 1993. The trial court concluded that Fraser failed to show that it was entitled to have the project suspended for that entire period, and we uphold the trial court's ruling in that regard.

Fraser concedes that it was foreseeable that its dike would be overtopped (and thus destroyed) at least once during the pendency of the project. The trial court concluded that in light of Fraser's dike design, all of the overtoppings of Fraser's dikes were foreseeable. The evidence before the trial court supports that conclusion. The evidence showed that even in an average summer, the peak water flows on the Zumbro River would be expected to exceed 800 cfs approximately 2.4 times; from that baseline, it was clearly foreseeable that in a summer of above average water flows, a dike of Fraser's design would be overtopped multiple times. Moreover, quite apart from the problem of continuing high flow rates, it was foreseeable that after each overtopping, time would be lost in repairing the dike and dealing with the inundation that accompanied the destruction of the dike on each occasion.

While Fraser argues that it expected the water to recede quickly after each overtopping event, the evidence on that issue is thin and does not indicate how quickly Fraser could reasonably have expected to be working "in the dry" after each overtopping event.[2] Certainly Fraser should have expected to lose some time rebuilding

---

**2.** The evidence on which Fraser relies for the proposition that water levels normally could be expected to recede quickly consists of a statement from the report of a government expert and the expert's testimony at trial regarding the "flashy" nature of floods on the Zumbro River. The expert, however, added that even in the summer of 1993 "there would

its dike each time it was overtopped. In addition, as we have noted, Fraser was granted a large number of weather-related extension days, many of which correspond to days on which Fraser contends it was faced with high water conditions. Accordingly, the evidence does not support Fraser's contention that it was entitled to an extended period of excusable delay from the beginning of June until the water levels in the river returned to normal two and a half months later.

Because it has not made a persuasive case that it was entitled to an extension for the entire period between June 1 and mid-August, Fraser can obtain relief on a theory of constructive acceleration only if there were particular days of excusable delay within that period for which Fraser made a valid claim for an extension that was not granted. After a careful review of the evidence, we hold that the trial court did not commit clear error in finding that Fraser failed to prove that there was any period for which it was entitled to an extension and its request for one was denied.

Significantly, although Fraser now contends that the project should have been suspended from the beginning of June, that was not its position at the time of contract performance. In his June 24, 1993, letter to the Corps, Fraser's president sought relief under the contract based on the extra work that resulted from the high water levels of June 18, 1993, but he did not seek relief based on the water levels earlier in the month, which he acknowledged were "within what has to be considered the usual nature inherent to this site." With respect to Fraser's claim regarding the high water conditions after June 18, Fraser was granted a weather-related time extension for each of the days between June 18 and June 24. Therefore, even assuming there were unforeseeable high water conditions on those days, Fraser would not be entitled to any additional relief for that time period. In fact, the only days in June after June 18 on which Fraser was not given a time extension were June 25, June 28, and June 29. Fraser has not made a particularized showing as to why it was entitled to an extension for those days, and the evidence does not support any such claim. Rather, the evidence shows that on those days Fraser was repairing the dike that had been destroyed earlier and that Fraser did not haul excavated material on those days at least partly because of concerns about the possibly contaminated nature of the soil.

On July 4, Fraser's dike was overtopped again. The evidence showed that the repair of the dike from that event was completed by July 24. During that three-week period, there were 10 days on which Fraser worked but was not given a time extension. The evidence showed that even while the dike was under repair during that period, Fraser was able to continue hauling material from the excavation site at essentially a normal pace. At the meeting among the parties on July 19, Fraser pressed its claim for monetary relief, including a claim that it had been subjected to constructive acceleration. The Corps refused to grant monetary relief, but it noted that it had extended the contract until September 16 and acknowledged that it was required under the contract to grant extensions for all "weather-related high flow conditions."

Fraser's dike was not overtopped again until August 15. On the days between

be a fairly steep recession" in water level following a particular rainfall unless that

rainfall "was followed up by additional rainfall."

mid-July and mid-August for which a time extension was not granted, the evidence showed that Fraser continued to haul materials from the excavation site at a normal pace. Within a week of the August 15 overtopping, the dike was again repaired. Fraser worked without an extension on only two of the days during that week, both of which were spent on dike repair. Although the mean daily flows continued at a higher level than average during the remaining period of contract performance, there were no more destructive events that breached the dike, and Fraser completed the excavation and hauling portions of the contract by the extended completion date of October 1, 1993. At oral argument, counsel for Fraser conceded that during late August and September Fraser was able to excavate efficiently and completed the excavation as it had expected to do during the initial contract performance period.

Under these circumstances, we sustain the trial court's conclusion that Fraser failed to prove that it was entitled to suspend operations for the entire summer. Moreover, because the evidence to which Fraser directs us does not establish that Fraser timely requested and was entitled to extensions for more than the 30 additional days it was granted to complete the contract, Fraser has failed to prove that it was entitled to an additional period for performance under the contract and was improperly denied an extension for that period.

### 3. Orders to Continue Performance

■ The trial court also found that the government did not force Fraser to accelerate its performance by pressuring it to work on days on which Fraser should have been given a time extension. The court explained that it did not "read the Corps' repeated emphasis on adherence to the contract as a constructive notice to accelerate."

In support of its claim that the government pressured it to complete the contract on time (while not granting extensions to which Fraser was entitled), Fraser places particular emphasis on a June 28, 1993, letter from the Corps urging Fraser to adhere to its schedule and advising Fraser that a failure to prosecute the work diligently would result in termination of the contract. Fraser argues that it interpreted that letter, a copy of which was sent to Fraser's bonding company, as a threat that forced it to continue working regardless of its entitlement to extensions. That letter, however, was sent before Fraser first made a claim for excusable delay based on high flow levels (as opposed to the peak flow of June 18 that destroyed Fraser's dike). In fact, the June 28 letter was sent shortly after the Corps received Fraser's June 24 letter in which Fraser acknowledged in writing that it was not entitled to relief for any of the delays before June 18 and took the position that the high water conditions of that date and thereafter constituted a differing site condition, a claim that was plainly wrong and that Fraser later abandoned. Furthermore, the evidence at trial indicated that the letter was precipitated not only by Fraser's lack of progress in the excavation portion of the contract work, but also because Fraser's subcontractor was refusing to haul materials it regarded as hazardous, which had nothing to do with the high water conditions. Because there was no reason for the Corps to believe at that time that Fraser had a valid claim for an extension for delays that were not weather-related, it was not unreasonable for the Corps to remind Fraser of its responsibility to ad-

here to its contract schedule. *See R.J. Lanthier Co.*, 04–1 B.C.A. ¶ 32,481, at 160,- 669 ("We do not regard this government pressure [to complete the contract on time] to be unreasonable or tantamount to an acceleration order particularly in the absence of a proper request for a quantified time extension based solely on excusable delay.").

Fraser also cites additional evidence of government pressure to complete the contract within the performance period as extended, including oral statements by Corps representatives in the course of the contract work. The evidence on which Fraser relies prominently includes a July 15, 1993, letter in which the Corps reminded Fraser that it was "solely responsible to prosecute the work in a manner which achieves satisfactory completion by the contract completion date of 01 September or approved extension thereof." The July 15 letter, however, did not suggest that Fraser was required to work regardless of whether it was entitled to an extension; in fact, by reference to extensions, the letter made clear that if Fraser was entitled to an extension under the contract, the completion date for the contract would be delayed accordingly. Moreover, as the trial court pointed out, in light of contract delays during periods for which Fraser was not claiming a right to additional time, "the Corps was correct to be concerned." Finally, as in the case of the June 24 letter, the July 15 letter was sent to Fraser before Fraser claimed an entitlement to an extension for the high water throughout the contract period.

To be sure, an expression of concern about progress, combined with a refusal to issue extensions, can be the equivalent of an order to accelerate. *See, e.g., Norair*, 666 F.2d at 548. Such expressions do not always constitute the equivalent of orders to accelerate, however, particularly if the expression comes before the time when the contractor has raised a specific and valid claim of right to an extension. The evidence at trial on this issue was mixed: Fraser introduced evidence that the Corps pressured it to complete the contract on time and refused to grant any extensions of time for high water conditions that were not directly related to adverse weather conditions at the work site. The government, on the other hand, introduced evidence that Fraser was granted a generous allotment of extensions for adverse weather, including wet conditions following periods of rain, and that Fraser never made a sufficiently specific showing of its right to additional extensions. Although the evidence on this highly factual issue is mixed, we hold that the trial court's conclusion that the Corps did not engage in conduct that constituted an order to accelerate the contract in the face of valid and particularized claims for additional time extensions is not clearly erroneous.

In conclusion, we hold that the trial court, after weighing the considerable volume of documentary and testimonial evidence introduced at trial, did not commit clear error in finding that Fraser failed to prove that it was constructively accelerated by the Corps' failure to issue timely extensions of the project schedule, or by its insistence on adherence to the project schedule without granting additional time for periods of excusable delay. Accordingly, we uphold the court's ruling that Fraser has not proved its right to additional compensation under the contract.

*AFFIRMED.*