ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| David Boland, Inc. | ) ASBCA Nos. 59313, 60294 |
| | ) |
| Under Contract No. W912P8-10-C-0079 | ) |

APPEARANCES FOR THE APPELLANT:   Daniel Lund, III, Esq.
　　Phelps Dunbar
　　New Orleans, LA

　　Denis L. Durkin, Esq.
　　Michael S. Vitale, Esq.
　　　Baker & Hostetler LLP
　　　Orlando, FL

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
　　Engineer Chief Trial Attorney
　　William G. Meiners, Esq.
　　　Engineer Trial Attorney
　　　U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

　　　These appeals arise from a U.S. Army Corps of Engineers (USACE or Corps) contract awarded to David Boland, Inc. (Boland or appellant) to construct T-wall and I-wall as part of a flood prevention project in New Orleans, Louisiana.  Boland brought this appeal on behalf of its primary subcontractor, Target Construction, Inc. (Target).  On July 1, 2011, Boland filed its initial claim seeking $10,397,574 for the increase in Target's total direct costs relating to alleged delays caused by passing trains between August 7, 2010 and May 21, 2011 (ASBCA No. 59313).  On November 4, 2014, the claim was revised downward to $7,892,922, including additional costs incurred by Boland (ASBCA No. 60294).  Boland's revised claim is based upon the same set of facts as its first, but this submission utilized a modified total cost methodology.  The contracting officer (CO) issued a final decision on July 23, 2015, which Boland appealed to the Board on October 16, 2015.  The Board has jurisdiction over these appeals under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109.  A three-day hearing was held in New Orleans.  Only entitlement is before the Board for decision.  For the reasons stated below, we deny the appeals.

**Solicitation and Award**

1.  On March 5, 2010, USACE issued Solicitation No. W912P8-10-B-0054 (R4, tab 75 at GOV001674). This solicitation sought firms interested in performing work pursuant to USACE's Lake Pontchartrain and Vicinity (LPV) Hurricane Protection Project, Lakefront Airport T-Walls, LPV 105.02 East Reach (R4, tab 75 at GOV001670-71). The work specified in the solicitation involved the replacement and construction of floodwalls along Haynes Boulevard in New Orleans, Louisiana (*id.* at GOV001676).

2.  On May 13, 2010, USACE awarded Boland Contract No. W912P8-10-C-0079 for the completion of specific flood prevention work in the amount of $19,472,000. The contract incorporated the solicitation (R4, tab 39 at GOV000958; tab 75 at GOV001674-80).

3.  The contract required the construction of approximately 5,700 feet of T-wall and approximately 2,200 feet of I-wall (tr. 1/21-22; R4, tab 75 at GOV001671). This entailed structural concrete work, pile driving, and earthwork on a site adjacent to two operational railroad tracks (*see id.* at 1/21-22; R4, tab 75 at GOV002219, GOV002254, GOV002437).

4.  The railroad tracks adjacent to the worksite were under the control of the Alabama Great Southern Railroad Company (the Railroad)), which, according to the parties, is a subsidiary of Norfolk Southern Railway Company (Norfolk Southern) (*see* R4, tab 10 at GOV000088; tab 75 at GOV001824-25, GOV001934; gov't statement of undisputed material facts in support of its motion for summary judgment at ¶ 8 and app. resp. at ¶ 8).

5.  The contract incorporated via full text Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (JUN 2007) (the Changes Clause). The Changes Clause provided:

> (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract including changes—
>
> (1)     In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished property or services; or

(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating

(1)     the date, circumstances, and source of the order and

(2)     that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.  However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after

(1) receipt of a written change order under paragraph (a) of this clause or

(2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

(R4, tab 75 at GOV001771)

6. The contract incorporated via full text FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (the Default clause). The Default clause provided in relevant part:

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work *arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.* Examples of such causes include

. . . .

(x) *unusually severe weather, or delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers . . . .*

(R4, tab 75 at GOV001782-83) (emphasis added)

4

7. The contract incorporated via full text FAR 52.236-15, SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984) (R4, tab 75 at GOV001767-68). This clause provided, in relevant part:

> (b)The Contractor shall enter the actual progress on the chart as directed by the Contracting Officer, and upon doing so shall immediately deliver three copies of the annotated schedule to the Contracting Officer. *If, in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including those that may be required by the Contracting Officer, without additional cost to the Government. In this circumstance, the Contracting Officer may require the Contractor to increase the number of shifts, overtime operations, days of work, and/or the amount of construction plant*, and to submit for approval any supplementary schedule or schedules in chart form as the Contracting Officer deems necessary to demonstrate how the approved rate of progress will be regained.

(*Id.*) (emphasis added)

8. The contract incorporated via full text Defense Federal Acquisition Regulation Supplement (DFARS) 252.236-7000, MODIFICATION PROPOSALS – PRICE BREAKDOWN (DEC 1991). Paragraph (d) of this clause provided that "[t]he Contractor's proposal shall include a justification for any time extension proposed." (R4, tab 75 at GOV001796)

9. The contract specifications required all work for the project to be completed within 375 days of Boland's receipt of the notice to proceed (NTP), which fell in early June 2011 (R4, tab 75 at GOV 001674; tr. 1/23-25). The LPV 105.02 project was considered to be part of the "hundred year level achieved" (HYLA) projects, a reference to the new system that was designed at a certain elevation to protect against the 100-year level storm (tr. 3/56-58).

10. The contract specifications required Boland to submit a construction schedule in the form of a Critical Path Method (CPM) within 10 calendar days after issuance of the NTP for USACE approval. The CPM was to be updated monthly and accurately reflect progress on the job. The contractor was also required to provide a comprehensive narrative report with each schedule update. (R4, tab 75 at GOV001946-48).

5

11.  The contract contained a liquidated damages clause imposing a $4,100 per day penalty for each day of delay past the deadline (R4, tab 75 at GOV001692; *see also* tr. 1/25).

**Working Adjacent to the Railroad**

12.  The contract specifications included several provisions that described working next to active railroad tracks (*see, e.g.*, R4, tab 75 at GOV001835-37 ("Cooperation and Delays," "Trainman's Walkways," "Guidelines for Personnel on Railroad Right-of-Way," and "Guidelines for Equipment on Railroad Right-of-Way"); GOV001842-43 ("Approximate Train Frequencies and Track Time")).

13.  Subparagraph (b) of Section 01100, ¶ 20, "Work on or Adjacent to Railroad" required, among other items, that the contractor shall fully coordinate his/her work with the operations of the Railroad Companies.  Subparagraph (c) of this provision required the contractor to comply with the regulations and requirements of the attached "Special Provisions for Protection of Railway Interest." Subparagraph (d) required the contractor to perform all work adjacent to or on the Railroad's property "so as not to interrupt or delay the operation of trains over the tracks in use, or to interfere with communications and signal lines adjacent to said tracks or upon said premises except under arrangements between the Contractor and the Railroad Companies."  (R4, tab 75 at GOV001865-66)

14.  Norfolk Southern granted a right-of-way under the limited circumstances as set forth in the "Special Provisions for Protection of Railway Interest" for the purpose of constructing that portion of the LPV 105.02 construction project located on the Railroad's right-of-way or property. (R4, tab 75 at GOV001824-1844)  On April 6, 2010, USACE issued Solicitation Amendment No. 0005 revising "Section 0800 Special Contract Requirements " – "Special Provisions for Protection of Railway Interest,"  making changes to paragraph 14 "Insurance" and repeating the extensive conditions related to work on or near the railroad:

> 3.  INTERFERENCE WITH RAILROAD OPERATIONS
>
> A.  The Contractor shall so arrange and conduct his work that there will be no interference with Railroad operations, including train, signal, telephone and telegraphic services, or damage to the property of the Railroad Company or to poles, wires, and other facilities of tenants on the rights-of-way of the Railroad Company. Whenever work is liable to affect the operations or safety of trains, the method of doing such work shall first be submitted to the Railroad Engineer for approval, but such approval shall not relieve

6

the Contractor from liability. Any work to be performed by the Contractor which requires flagging service or inspection service shall be deferred by the Contractor until the flagging service or inspection service required by the Railroad is available at the job site. The Contractor shall also coordinate all activities with the Railroad to avoid project delay and will make no claim against Railroad for any delays due to normal or reasonable Railroad operations. The Contractor shall perform all work on or adjacent to the Railroad's right of way or property in accordance with the plans submitted to the Railroad and at such a time and in a manner that does not create a safety hazard.

B. Whenever work within Railroad rights-of-way is of such a nature that impediment to Railroad operations such as use of runaround tracks or necessity for reduced speed is unavoidable, the Contractor shall schedule and conduct his operations so that such impediment is reduced to the absolute minimum.

C. Should conditions arising from, or in connection with the work, require that immediate and unusual provisions be made to protect operations and property of the Railroad, the Contractor shall make such provisions. If in the judgment of the Railroad Engineer, or in his absence, the Engineer, such provisions are insufficient, either may require or provide such provisions as he deems necessary. In any event, such unusual provisions shall be at the Contractor's expense and without cost to the Railroad or the Corps.

D. Any authorized Railroad official, employee, or agent has the right to stop any activity of Contractor if such activity may cause imminent danger to the Railroad, or if such activity may cause imminent danger to the Contractor's personnel, equipment, material or facilities due to the Railroad's operation. The Contractor shall be prohibited from engaging in an activity that may cause imminent danger to the Railroad, the Contractor's personnel, equipment, materials or facilities due to the Railroad's operation.

E.  The Railroad has and retains the right to fully enjoy and utilize any and all of its right of way or property, including those portions upon which the levee, floodwall, and/or floodgate is to be constructed, for its railroad operations and facilities and the location and extension of such additional facilities and structures as the Railroad deems useful or convenient, including, but not limited to, the right to construct, operate and maintain a track or tracks at any point or points through the levee, floodwall, and/or floodgate to the south to serve industries or for other purposes, and the rights of Railroad in its right of way or property shall not be impaired or restricted by the construction, maintenance, use or existence of the said protection levee, floodwall, and/or floodgate, its appurtenances, accessories, works and facilities, except that Railroad shall not hereafter use that portion of its said right of way or property upon which the protection levee, floodwall, and/or floodgate is constructed in such a manner as to decrease the height of the levee, floodwall, and/or floodgate or endanger its stability.

(R4, tab 10 at 1-22; R4, tab 10 at GOV000089-94)

15.  The contract specifications warranted that between 10 and 15 trains would pass through the project site per day, and amendments to the solicitation warned bidders to "expect 10-15 work stoppages per day." (R4, tabs 75 at GOV001842; 7 at GOV000038; 11 at GOV000116).  The clause "Special Provisions for Protection of Railway Interests," Appendix A, Outline of Specific Work Conditions" provided in relevant part:

1.  Approximate Train Frequencies and Track Time

a.  The tracks are used by freight trains (AGS) and passenger trains (Amtrak).  There are between 10 and 15 (2 Amtrak) trains per day split about equally between the north bound and south bound tracks.

b.  A work window is set up for 8AM to 12PM (noon) on all days except rail holidays on the north bound track (the track closest to the City).  Any track time that may be given on the south bound track (the one closest to the Lake) or outside the work window on the north bound track will be done purely based on the needs of the

8

Railroad. The term of this said work window shall begin on the first day on which the OLD/Corps/Contractor begins its construction work on the Project on the right of way or property and extend for two (2) years thereafter. Each day the Corps/Contractor shall be required to present themselves to the flagman so that the flagman may then each day formally request track time during the said work window. If on a particular day the Corps/Contractor does not present themselves to the flagman by 8AM, then the track time will not be available [sic] that day.

(R4, tab 75 at GOV001842-43)

16. Boland acknowledged that any track time outside the work window of 8:00 a.m. to 12:00 p.m. or on the southbound track would be "given by the Railroad purely based upon the needs of the Railroad." It was always anticipated that there would be windows that work could not be performed. (R4, tab 100 at DBI Disk 1 00002753-54; tr. 1/205-06; 3/22-23)

17. The contract specifications identified "Permissible Hours of Work" and provided that:

No work shall be done between 9:00 p.m. and 7:00 a.m. Monday through Friday, and between 9:00 p.m. and 8:00 a.m. Saturday and Sunday. The Contractor shall not start any equipment and shall not have any trucks - delivery, service, hauling, pile driving or extracting operations during the non-work hours.

(R4, tab 75 at GOV001863)

18. Sections 12 and 13 of the "Special Provisions for Protection of Railway Interests" incorporated into the contract stipulated that work was to be halted while trains were passing. These provisions provided in relevant part:

12. GUIDELINES FOR PERSONNEL ON RAILROAD RIGHT-OF-WAY

. . . . .

E. All welders and cutting torches working within 25' of track must stop when train is passing.

9

13.  GUIDELINES FOR EQUIPMENT ON RAILROAD RIGHT-OF-WAY

A.  No crane or boom equipment will be allowed to set up to work or park within boom distance plus 15' of centerline of track without specific permission from railroad official and flagman.

. . . .

D.  All cranes and boom equipment under load will stop work while train is passing (including pile driving).

E.  Swinging loads must be secured to prevent movement while train is passing.

. . . .

J.  All operating equipment within 25' of track must halt operations when a train is passing.  All other operating equipment may be halted by the
flagman if the flagman views the operation to be dangerous to the passing train.

(R4, tab 75 at GOV001835-37)

19.  The contract specifications included a damages provision maintaining that "[t]he Contractor shall assume all liability for any and all damages to his work, employees, servants, equipment and materials caused by Railroad traffic."  The specification also contained the following exculpatory language "Cooperation and Delays":

> No charge or claim of the Contractor against either the Corps or the Railroad will be allowed for hindrance or delay on account of railway traffic; any work done by the Railroad or other delay incident to or necessary for safe maintenance of railway traffic or for any delays due to compliance with these special provisions. . . .

(R4, tab 75 at GOV001831-5)

**Pre-Bid Site Inspection**

20.  A pre-bid conference and site visit was held on March 17, 2010, and was attended by representatives from both Boland and Target (R4, tab 78 at GOV003261). Boland's notes taken during the site visit, confirm that prospective bidders were advised that work could be expected to be stopped by passing trains 10 to 15 times per day except during the work window between 8:00 a.m. and 12:00 p.m. on the northbound track (*see* R4, tab 79 at DBI Disk 1 00001611).

21.  Target estimated a one-hour loss of production per day due to trains passing through the worksite (R4, tab 170 at DBI Disk 3 00005303; tr. 1/176). Notably, Boland estimated a two-hour loss of production per day due to passing trains (app. supp. R4, tab 126 at GOV110489).[1]

22.  On the Railroad Protection Liability Application, Boland represented to the insurance company that it expected to encounter 15 trains per day (R4, tab 91; tr. 1/85-86).

**Boland's Subcontract with Target**

23.  During the preparation of Boland's bid for the LPV-105.02 project, Boland prepared internal estimates to be used when evaluating the subcontractors' bids. Boland's estimate for the concrete work was $5,782,305.  Target's bid to Boland for the concrete work was $4,054,434.  Boland's internal estimate for the piling work was $9,280,413.  Target's bid to Boland for the piling work was $8,063,303.  Accordingly, Target's bid for concrete and piling work was $2,944,981 less than Boland's internal estimates.  While Mr. Boland was not as confident in the piling estimate because the company did not perform that work on their own at that time, he was confident in the concrete estimate.  (R4, tabs 83, 84; tr. 1/80-83)

24.  On May 26, 2010, Boland entered into a subcontact with Target in the amount of $9,057,913.45 "to furnish all labor and material and perform all work for Lake Pontchartrain and Vicinity, Hurricane Protection Project, Lakefront Airport T-Walls LPV 105.02 . . . for Items Nos. 0001 through 0021 . . . ."  (R4, tab 8 at GOV000046).  The subcontract required Target to provide temporary flood protection, temporary retaining structures, truck wash-down racks, demolition, formwork for concrete, expansion joints and waterstops in concrete, reinforcing steel, cast-in-place structural concrete, clearing and grubbing, excavation, structural excavation and backfill, dewatering, embankment, steel sheet piling, steel H-piles, concrete pavement, surfacing (granular), modifications to existing utilities, bonnetless knife gate valves,

---

[1] For purposes of this decision, we treat appellant's exhibits submitted prior to the hearing as its supplement to the government's Rule 4 file (*see* Board Rule 4(b)).

concrete slope pavement, and concrete scour protection for Items Nos. 0001 through 0021in accordance with Contract No. W912P8-10-C-0079.  (*Id.* at GOV000046, GOV000058).

25.  Target was the prime subcontractor for the project (tr. 1/26).  Target also served as Boland's prime subcontractor on the Bayou Segnette Project. Both projects were proceeding simultaneously.  (R4, tab 102; tr. 1/91-92)

**Boland's Work Plan**

26.  By letter dated May 18, 2010, USACE issued a notice to proceed to Boland.  Boland confirmed receipt of the notice on May 24, 2010.  (R4, tab 40)

27.  Pursuant to the contract's requirements, Boland submitted a "Railroad Right of Way Workplan" (Work Plan) to USACE dated June 28, 2010 (R4, tab 100 at DBI Disk 1 00002744; app. supp. R4, tab 9 at GOV040512).  The Work Plan's purpose was to "provid[e] a detailed description of the method, means and timing of the construction procedures, which Boland will be implementing during the on-site activities at the Lakefront Airport T-Walls LPV 105.02 East Reach project" (R4, tab 100 at DBI Disk 1 00002750; app. supp. R4, tab 9 at GOV040515; *see also* tr. 1/202-07).

28.  Boland acknowledged in its work plan all Railroad restrictions as set forth in Appendix A to the contract.  Boland advised the government in its work plan that they would require flagman services for the duration of the project.  (R4, tab 100 at DBI Disk 1 00002753-54; tr. 1/205-06)

29.  The Work Plan provided further detail on how work would be impacted by the railroad and the anticipated shutdowns when trains passed through the site:

> (3) Southern Piles
>
> The piles on the southern side of the T-wall are approximately twenty-seven feet from the centerline of the track and will be driven on a 3/1 batter which at times will require the crane boom and pile with leads to be extended over the southern track until the pile is driven.
>
> It will take approximately twenty five minutes to set the leads in place, drive the pile and remove the leads from the pile.  Therefore the flagman shall notify Boland of oncoming traffic so that Boland will not foul the tracks during pile installation.  During pile driving, we require

that the flagman provide thirty minutes notice of an upcoming train so that Boland can move the crane boom or complete the driving underway.

All effort will be given to attempt to drive the southern batter piles between the allowable track time of 8:00 to 12:00 AM.

(4) Northern Piles

Piles on the North side of the T-wall are on a 4/1 batter extending away from the tracks. During this operation neither the crane boom or piling will extend over to be within 20 feet of the southern track.

A flagman will be required during installation of these piles to notify the crew of oncoming trains, so that the pile driving operation can cease during times when trains are passing.

(R4, tab 100 at DBI Disk 1 00002783-84; app. supp. R4, tab 9 at GOV040548-49)

30. The Work Plan provided that the Railroad's authorized representative—the flagger or flagman assigned to the project site—was responsible for administering all shutdowns and flagging operations:

The authorized representative of [the Railroad] shall have final authority in all matters affecting the safe maintenance of Railroad traffic of his Company including the adequacy of the foundations and structures supporting the railroad tracks and the necessity for flagging during construction.

(R4, tab 100 at DBI Disk 1 00002752; *see also* tr. 1/202-04)

31. Furthermore, the Work Plan stipulated that all interactions between Boland and Railroad representatives required USACE facilitation:

All direct communications between Boland and [the Railroad] shall be in the presence of the USACE representative unless otherwise authorized.

(R4, tab 100 at DBI Disk 1 00002752)

13

32. On July 8, 2010, USACE, Boland, Railroad representatives, and other necessary personnel attended a coordination meeting to discuss the Work Plan as well as potential issues that would occur with working adjacent to the Railroad (app. supp. R4, tab 117 at GOV108148-09; *see also* tr. 1/32-34). USACE documentation summarized the meeting as follows:

> A railroad coordination meeting was held on Thursday, July 8th at the HPO Franklin trailer. The purpose of the meeting was to discuss the submitted railroad work plan, and to discuss the necessary steps to begin construction work adjacent to the Norfolk Southern Railroad.
>
> . . . .
>
> Leonard Fletcher (TGS/Norfolk Southern) discussed the submitted work plan and stated he wants to see a "worst case" crane set up (heaviest load, closest proximity to track, etc.).

(App. supp. R4, tab 117 at GOV108148)

33. Boland maintained its usual practice of preparing daily reports for this project, including the Daily Construction Reports (DCR), and the Contractor Quality Reports (QCR). The DCRs included specific work performed that day by Boland and each subcontractor, including all manpower and equipment that was utilized. The QCRs included information on equipment inspections and hours, labor hours, QC activities and deficiencies, job safety, work started and performed by contractor. (R4, tabs 203-204; tr. 1/106-08)

**Target's Interference Claims**

34. Shortly after commencing work on the project, Target alleged that it began experiencing substantial delays due to unexpectedly high numbers of trains passing through the worksite. Mr. Robert Mora, the project engineer for LPV 105.02, testified that "there was never a day where [Target] had—they could just work the entire day. You know, there was always some trains passing, you know, on a daily basis." (Tr. 3/6, 22-23)

35. Target voiced concerns to Boland about the frequency of passing trains. Boland advised Target that the specifications did not contemplate track time on the southbound track. Moreover, Boland complained that Target was slow to mobilize and had "essentially no measurable production." On October 5, 2010, Boland required Target to provide a baseline schedule in CPM format outlining what was planned,

14

taking into account the constraints set forth in the specification including track time and the limited permissible hours of work. (R4, tabs 109, 114; tr. 1/92-93)

36. Target alleged that each train that passed through the worksite during work hours delayed work by 1.05 hours on average. Target also alleged that these delays were so extensive that it "considered a day with 6 or more trains passing as a total lost day based on a 10 hour work day." (R4, tab 26 at GOV000423)

37. Target's vice president, Mr. Steve Fulmer, testified that on 106 days during the project, there were more than five trains that passed through the job site (tr. 2/5, 9; *see also* tr. 1/131 (similar testimony from Target's president, Mr. Jeff Fegert)). Mr. Fulmer also testified that there were several days when more than nine trains passed through the worksite (tr. 2/11-12). Specifically, Mr. Fulmer testified that:

- On September 16, 2010, 13 trains traveled through the worksite in a 13-hour workday.

- On October 17, 2010, 11 trains traveled through the worksite in an 11-hour workday.

- On March 13, 2011, 13 trains traveled through the worksite in a 12-hour workday.

- On April 3, 2011, 13 trains traveled through the worksite in a 12-hour workday.

- On May 13, 2011, 12 trains traveled through the worksite in a 14-hour workday.

(Tr. 2/12-13) Whether there were 5 trains or 13 trains that passed through the job site, the numbers were within the expected work stoppages per day that had been disclosed in the solicitation and in the site visit that Target and Boland had attended (findings 15, 20).

38. Mr. Fulmer further explained:

> Based on the just over an hour, hour-and-five-minute delay that we experienced per train on average, if you have six trains come through a job site, of course, that would get to six-and-a-half hours, based on the stop and start of work, the ineffectiveness of being able to do that. Target allocated that to be an entire lost day, because you would never have any—you would never realize any production

15

on a job. It would be physically impossible at that point in time.

(Tr. 2/19)

39. Boland's August and September 2010 daily quality control reports (QCRs) documented time losses caused by track time delays (*see* tr. 1/34-37). For example:

- "Track Time: We lost 3hr -10min today waiting for track time" (R4, tab 203 at GOV018631; app. supp. R4, tab 118 (QCR dated August 30, 2010)).

- "Track Time: We lost 3hr-10min today waiting for track time" (R4, tab 203 at GOV018633; app. supp. R4, tab 119 (QCR dated August 31, 2010)).

- "Track Time: We lost 3hr-45min today waiting for track time" (R4, tab 203 at GOV018636; app. supp. R4, tab 120 (QCR dated September 1, 2010)).

- "Track Time: We did not have track time (unable to work) from 8:05 am to 9:38 am, 11:57 am to 12:52 pm, and from 2:25 pm to 4:46 pm. This is a total of 4hrs and 49mins" (R4, tab 203 at GOV018640; app. supp. R4, tab 121 (QCR dated September 3, 2010)).

- "Track Time: We did not have track time (unable to work on T-wall) from 8:00 am to 9:45 am, 11:30 am to 1:30 pm, 2:50 to 3:15, and from 3:40 to 4:10 pm. This is a total of 4hrs and 40mins" (R4, tab 203 at GOV018647; app. supp. R4, tab 122 (QCR dated September 7, 2010)).

None of these QCRs specified whether trains were passing on the northbound or southbound tracks.

40. Target's president, Mr. Fegert testified that work was not only halted while a train was passing, but also for long periods of time before and after the train passed. Mr. Fegert added that the flagger would communicate with Target personnel regarding the time that work would be stopped, the extent of the delay, and the time at which the

16

work could be restarted. Mr. Fegert alleged that this resulted in long periods of time in which work could not be done:

> The actuality was we would be stopped, and sometimes a train would come in five, ten, 15 minutes. It was very seldom that soon, but it was usually somewhere, you know, like a half-hour, hour maybe. It was quite a while. I think our average shutdown time was an hour and five minutes, but there were some instances it was—it'd be hours before you saw a train.

(Tr. 1/134-35; *see also* tr. 3/48-49 (similar testimony from Mr. Mora))

41. Mr. Fegert testified that work beyond the 25-foot area was consistently halted before, during, and after the passing of a train: "[T]here was no respect for a 25-foot line on the project as being the guidelines that the flagger was working under. It was literally the project itself, which I would guess was 200 feet wide from the railroad tracks" (tr. 1/133).

42. Target also alleged that the 8:00 a.m. to 12:00 p.m. work window frequently was not honored. Mr. Fulmer testified that:

> There were numerous days that the 8:00 to 12:00 set-aside time for track time as defined here was not afforded to us during construction. And, again, I think, based on the log, it'll show that there [were] 90 trains that passed through in that work window time frame during the construction of the project.

(Tr. 2/10)

43. Mr. Boland testified that the issue of track time delays was "brought up by our quality control reports, and then later it was identified at the owner meetings, and then even in a few emails, it was addressed" (tr. 1/37).

44. Minutes from the September 8, 2010, October 20, 2010, and November 3, 2010, weekly owner's meetings with USACE personnel referenced Boland's concern of track time delays of between three and four hours per day and continued throughout the project (tr. 1/38-39, 1/41-42; app. supp. R4, tab 20 at GOV022508, GOV022510, 23 at GOV003780-81, 24 at GOV003773).

45. Mr. Fegert testified that Target increased its efforts and costs in order to meet the deadline (tr. 1/195). Specifically, he stated that Target's efforts to follow the

17

recovery schedule resulted in an impact of a "multiple of 50 percent or 100 percent" and that "efficiency dropped, not just by a little bit but a lot" (tr. 1/124-25).

46. Target prepared a Modified Track Time Log (Track Log) purporting to list all trains that passed through the job site during work hours for the duration of the claim period. As explained in detail by Mr. Fulmer, the data in the Track Log was extracted from train logs prepared by General Electric (GE). (R4, tab 228; tr. 2-39-49) The Track Log provides that throughout the 269-day claim period, a total of 1,345 trains passed through the worksite during working hours. There were 90 trains that traveled on the northbound track during the work window of 8:00 a.m. and 12:00 p.m. (*id.* at DBI Disk 5 008948).

**Target's Performance**

47. Boland began expressing concern about issues with Target's performance as early as June 22, 2010. For example, Target failed to provide its required submittals in accordance with the Work Plan, delaying the project by seven days. Boland had intended to submit the Work Plan to USACE no later than June 16, 2010. (R4, tabs 98; 206 at DBI Disk 1 00022646)

48. Issues with Target's performance, staffing, and management continued into August 2010 (*see* R4, tabs 106, 107, 203 at GOV018593, GOV018603 (descriptions of Target's deficiencies in quality control reports)).

49. Target leased an RG19T piledriving hammer to perform piling work for the project, which was delivered to the site in August 2010 (R4, tab 216 at 4, 8). Target experienced several problems with the RG19T. Many of the segments driven by the RG19T were out of plumb and out of alignment, requiring Target to pull the segments out of the ground and redrive them. This continued for 36 days, with only 15 paired segments of sheet piles being properly driven. The RG19T was eventually replaced with a conventional vibrating hammer and crane. (*Id.* at 8-9; tr. 1/206, 222-24)

50. The project required Target to drive approximately 1,485 paired sheet pile segments to construct the I-wall. Target budgeted 33 days of crew time at an estimated cost of $280,000 to drive the piles. Target claimed that it took its conventional sheet pile-driving crew an additional 110 days at a cost exceeding $3 million to complete the pile driving. (R4, tab 216 at 9-10)

51. Target's first sheet pile was not driven until August 7, 2010 (R4, tab 203 at GOV018582). By letter dated August 18, 2010, Boland's project manager, Mr. Bill Thomas, expressed concern about delays resulting from "Target's inactivity and lack of personnel, supervision, and equipment" and directed Target to "take whatever steps

18

are required, including providing additional manpower and working additional shifts" to get back on schedule (R4, tab 106 at DBI Disk 3 00004701, 00004703).

52. By August 18, 2010, Boland was complaining about Target's delay to the "Four Week Short Interval Schedule" resulting from "Target's inactivity and lack of personnel, supervision and equipment." Target was told to accelerate to meet the project schedule. (R4, tabs 106 at 1; 206 at DBI Disk 1 00022646)

53. Boland prepared Daily Construction Reports (DCRs) (R4, tab 204; tr. 1/107-08). Boland's DCRs identified numerous issues with Target's performance, ranging from undersized rigging on the pile drive stopping operations, deficiencies relating to the silt fence, demolition equipment not being on site, sheet piles outside of specific tolerance, Target's failure to send a truck to pick up sheet pile, realignment of piles, failure to set mats on top of the levee stopping work, no bucket for the excavator to load trucks, failure to correct deficiency reports, and other continuing equipment issues (R4, tab 204 at 1-4, 6, 9, 11-12, 73).[2]

54. Issues with Target's performance, staffing, and equipment continued into September 2010 (*see* R4, tabs 109,110, 111, 112, 113 (email correspondence between Boland and Target representatives), 206 at DBI Disk 1 00022650).

55. USACE's Project Engineer for this contract, Mr. Mora, was employed by Linfield, Hunter & Junius, a local engineering firm who contracted with USACE for his services. Mr. Mora observed that Target "struggled with sheet pile driving. They didn't seem to have workers that were familiar with the process of driving sheet pile" (tr. 3/6-7, 26-27).

56. By email dated September 10, 2010, Boland's construction manager, Mr. Jason Whitworth, voiced concern that "Target is failing miserably in getting any sort of consistency in the installation of the sheet piles and continues to delay the project schedule," identified numerous delays allegedly caused by Target between July 9 and September 8, 2010, and concluded that Target was 23 calendar days behind schedule on commencement of the piles (R4, tabs 109 at DBI Disk 3 00008922; 206 at DBI Disk 1 00022650; *see also* tr. 1/92-93).

57. By email dated September 29, 2010, Mr. Whitworth advised Target that it was 45 calendar days behind the critical path and directed Target to provide a recovery plan. Mr. Whitworth's email made no mention of delays caused by passing trains. (R4, tab 111)

---

[2] We have used the pdf page numbers for Tab 204 as it did not contain Bates numbers.

58. As of October 8, 2010, Target had still not hired a pile crew for the project (*see* R4, tabs 115; 206 at DBI Disk 1 00022654; tr. 1/209-10).

59. Target's equipment issues and ensuing delays to the project continued to mount well into November 2010 (*see* R4, tabs 118, 120, 123, 124). By letter dated November 19, 2010, Mr. Whitworth informed Target that it would be found in default of the subcontract agreement if it could not meet certain minimum objectives (R4, tab 120). Boland's president, Mr. David Boland, testified that the November 19 letter was issued out of concern about Target's own performance issues in addition to those attributable to train traffic (tr. 1/19, 95-96; R4, tab 206 at DBI Disk 1 00022657).

60. By letter dated November 22, 2010, Mr. Fegert complained to Mr. Boland of numerous delays to the project it encountered, including "ineffective and untimely lane closures, traffic control, schedule sequencing, down time due to excessive train traffic, the premature direction by Boland to mob[ilize] an oversized 300-ton crane to site, additional weight of H pile, pending change orders or [request for information] issues, ETC." (R4, tab 121 at DBI Disk 3 00004773).

61. Throughout December 2010, several issues unrelated to train traffic, including weather, equipment, and personnel-related problems, continued to delay the project, including several workmanship issues that necessitated that Target perform rework. Target was also experiencing a shortage of crane operators causing a significant increase in hourly wages. (*See* R4, tabs 127, 128, 129, 130, 131, 132, 133, 142, 147; 206 at DBI Disk 1 00022661)

62. Boland's Project Schedule was updated monthly throughout the project. Each report includes a section entitled "Critical Path Explanation" (CPM) and "Potential Problems/Delays." In the December 8, 2010 CPM narrative, Boland stated that "due to complications regarding the construction equipment we encountered 18 days of delay during the update period. Work will be accelerated to mitigate these 18 days of delay and get the project back on schedule." The January 10, 2011 narrative identifies an additional day of delay during the updated period because of "complications with the conflict between the H piles and the existing sheet piles." Boland acknowledges the need to mitigate the 19 days of delay. In the March 9, 2011 narrative, Boland identified an issue relating to a timely response from the government on the sluice gate. The May 12, 2011 narrative anticipated future delays as a result of secondary work being delayed. Finally, the last problem identified a 39-day delay associated with the differing site condition and reference that a cost proposal would be submitted to the government. (R4, tab 205 at 5, 6, 8, 10)

63. None of Boland's monthly schedule narratives identify delays associated with train traffic. (*id.*)

20

64. In an email dated December 7, 2010, Target's project manager, Mr. Don Boehme, admitted there were delays to the project "associated with the Mantiowoc Crane on the West End of the Project intended to be used to drive H-pile." Problems with the Mantiowoc Crane persisted throughout the project. (R4, tabs 129, 141).

65. In a letter from Boland to Target dated December 23, 2010, Mr. Whitworth identified numerous actions or inactions taken by Target in November and December 2010 that impacted the critical path and opined that "Target has yet to fully utilize the currently allotted track time. In fact, the current delays are directly related to the mobilization (due to delivery/certification/inspections), breakdowns and maintenance of Target's pile driving equipment." The email concluded by adding that "Target is behind schedule due to circumstances within Target's control." (R4, tab 135 at DBI Disk 3 00009153)

66. Target's equipment problems, personnel and management issues persisted into February 2011 (*see* R4, tabs 141, 146, 148, 150).

67. By email dated February 1, 2011, Boland's executive vice president, Mr. Jon Eberhart, expressed concern to Mr. Fegert that "the 1 June 2011 contract completion date is quickly getting out of reach" and attributed Target's failure to meet its required level of production to "ongoing equipment issues" (R4, tab 141 at DBI Disk 3 00009212).

68. By email dated February 13, 2011, Mr. Boland advised Mr. Fegert that "[i]f the truck crane is not efficiently driving steel sheet piling by the end of the day on Monday we intend to procure whatever equipment is necessary to efficiently drive the sheet piling." Mr. Boland also contradicted Mr. Fegert's statement from the previous day that "all other areas are proceeding well." (R4, tab 150)

69. By letter dated February 16, 2011, USACE's administrative contracting officer, Mr. William Rossignol, expressed concern about Boland's progress, directed Boland to "take all necessary steps" to meet the deadline, and emphasized the importance of finishing the project by that date. The letter stated:

> As was discussed in the preconstruction conference and numerous other meetings, all Walls shall be constructed by June 1, 2011, on the subject contract. At the current rate of progress, especially H-Piles and Sheet Piles, the June 1, 2011 date is at risk. The H-Pile and Sheet Pile production rates shall increase. At this time, you shall take all necessary steps so that H-Pile and Sheet Pile production rates can support the June 1, 2011 date. These steps shall

21

be outlinied [sic] in an updated schedule accompanied with a narrative plan by close of business February 22, 2011. The narrative shall include a description of equipment, manpower, shifts, etc.

In addition, a review of your construction schedule indicates that as of January 31, 2011, you are 10% behind schedule for overall completion of the project. Contract Clause 52.236-15, Schedules For Construction Contracts, requires that your company follow the approved schedule in order to complete the work within the required timeframe of the contract.

In accordance with contract clause 52-232-5, Payments Under Fixed-Price Contracts, ten percent (10%) of the pay estimate for period covered February 1, 2011, thru February 28, 2011, will be withheld due to unsatisfactory work progress. Ten percent of future progress payments will also be withheld until satisfactory progress is achieved.

(R4, tab 14)

**Boland's Cure Notice to Target**

70. On February 16, 2011, Boland sent Target a cure notice for failure to make adequate progress on the project (R4, tab 151).

71. By letter dated February 17, 2011, Mr. Fegert notified Mr. Whitworth that Target would be submitting a request for equitable adjustment (REA) for excessive track time delays. Mr. Fegert's letter also requested an unspecified time extension. (App. supp R4, tab 53 at GOV015064-65)

72. Mr. Fegert responded to Boland's cure notice via letter dated February 18, 2011. While Mr. Fegert attributed Target's delays to train traffic and operations on the railroad, he identified several other causes such as weather conditions, delays in the issuance of security badges, Boland's direction to mobilize a large crane to the worksite, a differing site condition, closure of Hayne Boulevard and Downman Road, and a crowded worksite. (R4, tab 153)

73. On February 21, 2011, Boland provided the requested recovery schedule in response to USACE's February 16 letter (R4, tab 15; *see also* tr. 1/46-49).

74. On February 28, 2011, USACE approved Boland's accelerated recovery schedule (R4, tab 16; *see also* tr. 1/49-52). Regarding the delays to the project, USACE advised Boland to "[q]uantify this delay and submit a request for equitable adjustment" (R4, tab 16 at GOV000172).

75. That same day, Mr. Boland replied to Mr. Fegert's February 18 letter, stating that "Target has ineffectively utilized the available working hours, including requested track time" (R4, tab 154 at DBI Disk 3 00009343). Mr. Boland noted that Target had failed to identify any of the other claimed causes of disruption to the project prior to Mr. Fegert's February 18 letter (*id.* at DBI Disk 3 00009343-45). Mr. Boland also challenged Mr. Fegert's account of the crane mobilization, asserting that "Boland provided no input or direction on the size of the crane to be mobilized" (*id.* at DBI Disk 3 00009343). Finally, Mr. Boland reiterated to Mr. Fegert that Boland required documentation of the delay caused by the road closures (*id.* at DBI Disk 3 00009344). Mr. Whitworth also forwarded Mr. Fegert's February 17 letter to USACE that same day, advising that Target would be seeking an equitable adjustment based upon perceived "unreasonable and excessive delays" due to track downtime, and that USACE should "review the attached letter from Target, dated 17 February 2011 which outlines their position and contact [Mr. Whitworth] should you have any questions regarding this matter" (app. supp. R4, tab 53 at GOV015063; tr.1/112-13).

76. Mr. Boland testified that Boland "didn't request a specific extension of time" (tr. 1/105).

77. Target's performance difficulties continued into March 2011. Target failed to properly drive piles plumb as required by the contract specifications (*see* R4, tab 156). Target also continued to experience extensive personnel issues, including failure to mobilize for low-profile work in accordance with the CPM schedule (*see* R4, tabs 157, 158, 159, 160).

78. On or about March 21, 2011, Norfolk Southern observed that the track in the area where Target was driving piles was shifting and settling due to construction activity (R4, tab 174). While Target had been allowed to continue pile driving even while trains were passing since January 2011, Norfolk Southern determined that this could no longer be permitted due to concerns about the track structure (*id.*; R4, tab 162).

79. By letter dated April 7, 2011, Target informed Boland that track time delays "resulted in a tremendous cost impact to Target and, subsequently, has required Target to substantially accelerate the project utilizing several more crews, equipment, additional time, overtime, days, and material so as to complete the project by the date required by the contract" (R4, tab 170 at DBI Disk 3 00005302).

23

**Hayne Boulevard and Downman Road Closure Impacts**

80.  By letter dated April 12, 2011, Boland submitted a cost proposal to USACE in the amount of $3,603,030 for the delays caused by the Hayne Boulevard and Downman Road closures (R4, tab 210).  Boland's email also requested a 60-day time extension (*id.* at GOV022607).

81.  On June 7, 2011, Boland forwarded to USACE a signed copy accepting Modification No. (Mod.) P00003 awarding Boland $975,092 for "Resolution of Downman Rd Closure Impacts."  Mod. P00003 also granted Boland a time extension of 60 calendar days, which the parties agreed would not apply to "HYLA associated" work.  (R4, tab 211)

**Weather Delays**

82.  On October 6, 2010, the government issued Mod. A00003 and extended the contract completion date by six calendar days because of weather delays (R4, tab 220).

83.  On June 13, 2011, Boland requested a 27-day non-compensable time extension due to weather (R4, tab 179).

84.  On July 25, 2011, the government issued Mod. A00013 and extended the contract completion date by another seven calendar days because of weather delays (R4, tab 221).

**Target's Disputes with its Subcontractors**

85.  David Boland Inc., Target Construction, Inc., and their surety companies filed suit against Barcelona Equipment, Inc. in the Eastern District of Louisiana. Jeffery Fegert, President of Target, testified in a declaration in Action No. 11-2295, Eastern District of Louisiana, that the sheetpile-driving work, that Target had planned to perform in 33 days required an additional 110 days, and that it incurred an additional $3,000,000 in costs, as a direct result of the equipment problems it suffered with the RG19T pile driving hammer (R4, tab 216 at 9-10).

86.  Target asserted that it suffered delay on the LPV 105.02 Project at the hands of its subcontractor Vice Construction Co., Inc. (Vice).  In a lawsuit against Vice, Target claimed that Vice was unable to perform the standard pile driving and low-profile driving work it was contracted to perform because Vice's pile driving equipment was inadequate to maintain a steady production rate causing a 40 percent down-time.  (R4, tab 219 at 3)

24

87. . In these appeals, there was no attempt by either Boland or Target to segregate out the subcontractor delays from the delays it claims were caused by train traffic. (R4, tab 218 at 13-16)

**Contract Completion**

88. The final H-pile for the project was driven on May 5, 2011 (app. supp. R4, tab 3 at GOV017039).

89. All work required for the project was completed by the deadline (*see* app. supp. R4, tab 56 at GOV042394).

**Boland's REA**

90. Boland submitted an REA, dated July 1, 2011, to USACE in the amount of $10,397,574 for "operation shutdown for passing trains" (R4, tab 18 at GOV000214; *see also* tr. 1/54-55).

91. By letter dated October 26, 2011, USACE issued a preliminary rejection of Boland's REA, stating that "[QCRs], Boland's own Field Job Logs, and meeting minutes suggest strongly that delay was primarily caused by subcontractor inability to manage the manpower, material and equipment to complete the required scope of work" (R4, tab 20 at GOV000385).

92. Boland resubmitted its REA in the form of a "Report of Findings" prepared by the consulting group J. Caldarera & Company, Inc., dated May 30, 2012 (R4, tab 77 at BOLAND000483; *see also* tr. 1/58-59).

93. At a meeting held on August 23, 2012, the contracting officer indicated she was willing to consider the days of train delay as referenced in the REA under certain conditions (R4, tab 22; tr. 1/59-60).

94. Boland sent a letter dated December 18, 2012 to USACE's CO, Ms. Cynthia Nicholas (R4, tab 23 at GOV000402). Attached to this letter was a letter from Target revising its REA to $7,118,420.48 with a loss of track time of 183 days (*id.* at GOV000407).

95. By letter dated December 27, 2012, CO Nicholas advised Boland to submit additional documentation supporting its REA and methodology for calculating costs (R4, tab 24; *see also* tr. 1/62).

96. By letter dated January 25, 2013, Boland submitted a revised REA "in which [Boland] provides documentation of meeting denoting the impacts of train

delays and a train log with duration by Target, subcontractor, and duration, by Boland, prime contractor" (*see* R4, tab 25 at GOV000414, GOV000418).

97. USACE's estimator, Mr. Renato Basurto, drafted a "Modification Government Estimate of Reasonable Contract Costs" dated February 5, 2013, with the description "Delays Due Excessive Trains" awarding Boland $568,960.13 for 22 days of delay due to passing trains (app. supp. R4, tab 12 at GOV101225-26; *see also* tr.2/21-22). The estimate stated:

> It is assumed that reasonable delay per day is 2 hours and any time above the 2 hours is considered to be excessive and the Government is reasonable [sic] for these delays. Taking the contractor's provided time per day and substracting [sic] 2 hours per day the contractor would have been delayed 223 hours. Since the contractor was working on the average 10 hours per day, the contractor is due 22 calendar days.

(App. supp. R4, tab 12 at GOV101233) It is not clear from this document how USACE had determined that Target had actually suffered delays due to the train traffic, other than by "[t]aking the contractor's provided time per day. . ."

98. On February 13, 2014, USACE unilaterally issued Mod. P00005, which awarded Boland $568,960.13 and a time extension of 22 days. Mod. P00005 provided that "[t]he contract for HPO-LPV 105.02, Lakefront airport T-Walls, Orleans Parish, LA is hereby modifiied [sic] to include the definitization of REA-004 for excessive train delays." (R4, tab 25 at GOV000410-11; *see also* tr. 1/63-64)

99. By letter dated June 11, 2014, Boland expressed that it did not accept the monetary relief provided by Mod. P00005 as an equitable adjustment and requested a contracting officer's final decision (COFD) on its REA (app. supp. R4, tab 129; *see also* tr. 1/65-66).

100. By letter dated November 4, 2014, Boland submitted a revised proposal utilizing a modified total cost methodology for its REA to USACE in the amount of $7,892,922, which included additional support for Boland's claim, including the data obtained from GE documenting the number of trains that passed through the worksite during the relevant timeframe. The General Electric (GE) train log data submitted by Boland provides that there were 1,345 trains passed during work days and that 90 of those trains passed on the northbound track between work hours of 8:00 a.m. and 12:00 p.m. Target states that it was able to use the daily logs to identify 568.4 hours of delay with 579 trains. Target also states that Boland's daily logs identify 267.9 hours

26

of delay with 243 trains.  (R4, tab 76 at BOLAND000001,3,7,9; app. supp. R4, tabs 115 at 7; 228 at 1-33; *see also* tr. 1/66-67, 2/30-31; finding 46)

101.  In response, USACE's estimator, Mr. Matt Bowman, drafted a "Modification Government Estimate of Reasonable Contract Costs" dated July 8, 2015 with the description "Track Time Delay REA" awarding Boland $1,210,486 for 32 days of delay due to passing trains (R4, tab 27 at GOV000885-86, GOV000890).  This estimate relied on the train records Boland provided and determined that:

> Train records were provided that included all trains that travelled through the jobsite from the period of August 2010 to May 2011.  The records show that the contractor is correct in stating that an excessive number of trains shutdown the jobsite for the subject time period.

(*Id.* at GOV000890)  It is not clear from this statement how USACE determined that there were an "excessive number of trains."

102.  On July 23, 2015, the CO issued a final decision awarding Boland $1,707,971 (including the $568,690.13 paid under Mod. P00005) and 32 days (321 hours of total delay) as compensation for track time delays (R4, tab 4 at GOV000006, GOV000014, GOV000019).

103.  On November 23, 2015, Boland filed its complaint with the Board (compl. at 10).  The complaint sought the full $7,892,922 Boland requested in its revised REA (*id.* at 10).

104.  The Board docketed ASBCA No. 59313 on May 14, 2014.

105.  The Board docketed ASBCA No. 60294 on October 21, 2015, and consolidated Appeal No. 60294 with Appeal No. 59313.  Appeal No. 60294 was filed as a protective appeal and "encompasses one claim, a claim for compensation for delays due to excessive train traffic and impediment of work from passing trains at the job site." (app. br. at 1).

106.  On April 20, 2016, USACE issued Mod. P00006 to reflect the July 20, 2016 COFD, providing $1,181,017 in compensation to Boland for the track time delays and an extension of 32 days to the contract completion date (app. supp. R4, tab 127).  Mod. P00006 stipulated:

> It is further understood that this Modification is being issued on a unilateral basis due to failure to agree on a reasonable amount of down time per train passing through the site, the actual amount of down time experienced by

27

the contractor per train, the total number of trains that should have been expected during the duration of the contract and the actual number of trains that passed through the jobsite during the duration of the contract.

(*Id.* at 3)

**Pile Log Comparison**

Boland hired a third-party contractor to prepare a Pile Log for the duration of the LPV-105.02 project. The information in the pile log was recorded as work was being performed on the project. The Pile Log collected detailed information including a start and stop time for each pile, how many hits per foot, weather, and temperature, on every pile that was driven on the project. We find the Pile Log to be reliable evidence of when the piles were driven and under what conditions. (R4, tab 223; tr. 3/50-51)

107. The USACE Project Manager, Mr. Mora, compared Boland's claim to the information contained in the Pile Log and found numerous discrepancies. (Tr. 3/50-52; R4, tabs 223, 228)

108. Based upon the location, Mr. Mora concluded that the work at Monoliths (wall sections) 175 through 180 were not impacted by track time (tr. 3/25-26, 30-32; R4, tab 240 at 25 (Drawing C-12)).

109. While the claim identifies delays at Monoliths 222 through 227, the pile logs show no impact from track time at Monoliths 222 through 227, and one-half of 228 (tr. 3/32-33; R4, tab 240 at 25)

110. Target claims that on September 11, 2010, it was delayed by the passing of train no. 130 at 4:51:27 p.m. (CST) or 1.05 hours. The pile driving log for September 11, 2010 shows that on that same date and time at Monolith 213, H Pile No. 8 was being driven from 4:50 p.m. through 5:15 p.m. At Monolith 213, Pile No. 10 was driven beginning at 5:24 p.m. The pile driving was stopped on September 11, 2010 at 6:50 p.m. because of repair work that was needed on the hammer. A new hammer was installed two days later, on September 13, 2010 with work starting again at 3:45 p.m. (R4, tabs 26 at GOV000421; 223 at GOV105305-07; 228 at DBI Disk 5 008920)

111. On September 13, 2010, Target claims its progress was delayed by the passing of train no. 130 beginning at 4:53:31 p.m. (CST) for 1.05 hours. The pile driving log shows that on September 13, 2010, at Monolith 214, H-Pile No. 1 was

driven from 4:42 p.m. through 5:12 p.m.  (R4, tabs 26 at GOV000421; 223 at GOV105319; 228 at DBI Disk 5 008920)

112.  Target states that on September 16, 2010, its workers were delayed beginning at 4:10:34 p.m. by three trains (nos. 22R, 172, 393).  The pile driving log shows that work on the H-piles at Monolith 214 was proceeding during the same time period Target claimed to be unable to work.  Pile No. 6 at Monolith 214 was being driven from 3:55 p.m. through 4:14 p.m.; the pile log reflected that work stopped for passing trains at 4:20; Pile No. 14 was then driven between 5:00 and 5:12 p.m.; Pile No. 16 at Monolith 214 was driven between 5:25 and 5:45 p.m.; Pile No. 7 at Monolith 214 was being driven from 5:57 through 6:15 p.m.  (R4, tabs 223 at GOV105324, 105325, 105332, 105334; 228 at DBI Disk 5 008920)

113.  Target states that on October 9, 2010, its workers were delayed for 1.05 hours by train no. 198 beginning at 10:15:02 a.m.  That same date, work on the H-piles at Monoliths 212 and 213 were proceeding during the same time Target claimed to be shut down.  Pile No. 18 at Monolith 212 was driven from 10:15 until 10:30 a.m.; Pile No. 13 at Monolith 213 was driven between 10:47 and 11:12 a.m.; and Pile No. 12 at Monolith 213 was driven between 11:15 and 11:42 a.m.  (R4, tabs 26 at GOV000421; 223 at GOV105294, 105309; 228 at DBI Disk 5 008923)

114.  Target states that on October 9, 2010, its workers were delayed for 1.05 hours by train no. 198 beginning at 2:40:22 p.m.  The pile driving log once again shows that work on the H-piles at Monoliths 212 and 213 were proceeding on the same date and time period Target claimed to be shut down.  Pile No. 2 at Monolith 213 was being driven from 2:30 through 2:55 p.m.; Pile No. 17 at Monolith 212, was driven between 3:19 through 3:42 p.m.; and Pile No 10 at Monolith 212 was driven from 3:54 to 4:15 p.m. (R4, tabs 223 at GOV105286, GOV105293, 105299; 228 at DBI Disk 5 008923)

115.  Target claims there were periods that the entire day was lost due to the passage of more than nine (9) trains.  They included:

> September 16, 2010—13 trains travel through the job site in a 13 hour workday

> October 17, 2010—11 trains travel through the job site in a 13 hour workday

> March 13, 2011—13 trains travel through the job site in a 12 hour workday

> April 3, 2011—13 trains travel through the job site in a 12
> hour workday

> May 13, 2011—12 trains travel through the job site in a 14
> hour workday

(App. br. at 12)  None of the dates that Target claims to have lost an entire day due to trains traffic are supported by the contractor quality control reports or the Pile Driving Log (R4, tabs 203 at GOV018667-69, GOV018750-51, GOV019286-89, GOV019390-93, GOV019579-82; 223 at GOV104659-63, GOV104691-94, GOV104699-702, GOV105243-44, GOV105256-61, GOV105269, GOV105306, GOV105320-2, GOV105324-5, GOV105332, GOV105334, GOV105438, GOV105443, GOV105445, GOV105449, GOV105473-76, GOV105478-82, GOV105652-58, GOV105662-68, GOV105779-84, GOV105787-94).  In fact, in its brief, USACE has convincingly demonstrated that on 36 days where Target claimed an entire lost day, Target was actually performing work and achieving higher productivity compared to the rest of the month in which the delay allegedly occurred (gov't br. at 5-6 (citing R4, tabs 224, 228).

## DECISION

*The Parties' Contentions*

Boland alleges that USACE constructively changed the contract by requiring Boland to meet the "immutable" June 2011 deadline despite the delays caused by train traffic, thus constituting a constructive acceleration (app. br. at 33).  Specifically, Boland contends that the delays it and Target faced were excusable (*id.* at 33-35; app. reply at 2-13), that USACE directed it to accelerate the project (app. br. at 35-39), and that it expended additional labor, equipment, and funds to meet the deadline as a result (app. br. at 39).  USACE counters that Boland and Target have failed to demonstrate that the delays were unreasonable or excusable (gov't reply br. at 3-22), that Boland never made a request for a time extension (*id.* at 22-25), and that Boland and Target have not adequately demonstrated that Target expended additional resources to meet the deadline (*id.* at 28-30).

*Standard of Review*

We begin our discussion by addressing Boland's reliance upon statements in the July 23, 2015 COFD as proof of its claim (app. br. at 2-3, 28-29).  Boland appears to be under the impression that statements made within the COFD are binding upon the Board (*see id.* at 28-29), while USACE challenges Boland's attempt to use these statements as admissions (gov't reply br. at 2).  We remind the parties that "when suit is brought following a contracting officer's decision, the findings of fact in that

30

decision are not binding upon the parties and are not entitled to any deference" and "a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision." *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994). Boland's attempt to rely upon content from the COFD as a demonstration of entitlement is thus misplaced. Any proceeding before the Board is reviewed de novo and "once an action is brought following a contracting officer's decision, the parties start . . . before the [B]oard with a clean slate." *Id.* at 1402.

*Third-Party Delays*

This contract required work on or adjacent to the property of a Railroad (finding 13). Among other things, it required the contractor to "so arrange and conduct his work that there will be no interference with Railroad operations. . ." (finding 14). It specifically warned contractors that:

> The Railroad has and retains the right to fully enjoy and utilize any and all of its right of way or property, including those portions upon which the levee, floodwall, and/or floodgate is to be constructed, for its railroad operations and facilities and the location and extension of such additional facilities and structures as the Railroad deems useful or convenient. . .

(*Id.*).

The contract provided that 10 to 15 trains per day would pass the work site, split equally between the north and southbound tracks (finding 15). The government informed bidders at least twice that 10 to 15 trains per day meant 10 to 15 work stoppages per day and Boland demonstrated that it understood this (findings 15, 20, 22).

The crux of Target's claim is that there were more train delays per day than it expected and that the delay from each train was longer than it expected (findings 36, 100). Before we begin, the Board notes that the former allegation is baseless because the documents Target has submitted indicate that 1,345 trains passed the site over 269 days, an average of only five per day, much less than the 10 to 15 trains identified in the contract[3] (finding 46). The latter allegation concerning the length of the delays, is unsupported, as we discuss below.

---

[3] Target does not cite any days in which there were more than 15 trains. The worst days that it can cite are five days in which there were 11 to 13 trains (app. br. at 12).

In any event, Target is not contending that the actions of USACE or another government agency delayed the work. Rather, it contends that a third-party, the Railroad, delayed its work and that USACE should pay for those delays. The law is very unfavorable for contractors asserting such third-party delay claims. The Federal Circuit has held that it is "settled that absent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties." *Oman-Fischbach International (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002) (quoting *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 698 (1964)). The Federal Circuit and the Court of Claims have applied this rule to delays caused by a foreign government, *Oman-Fischbach*, 276 F.3d at 1385, by a local government, *Dale Constr. Co.*, 168 Ct. Cl. at 698, and by another contractor, *Gilbane Building Co. v. United States*, 333 F.2d 867 (Ct. Cl. 1964).

On this contract, USACE represented that there would only be limited relief from the operation of the Railroad. Specifically, the contract provided that there would be a "work window" between 8:00 a.m. and 12:00 p.m. on the north bound track. Beyond that, however, the contract made it clear that any further availability was up to the Railroad. It provided that "[a]ny track time that may be given on the south bound track. . . or outside the work window on the north bound track will be done purely based on the needs of the Railroad." (Finding 15). Further, the contract specifically provided that Boland would have no claim against either the Railroad or USACE for delays or hindrances due to railway traffic (finding 19). Reading these provisions in the context of the third-party delay rule, the Board concludes that USACE, at most, could be liable for trains that passed on the north bound side between 8:00 a.m. and 12:00 p.m.

This brings us to the first of several major problems with the claim. Target's claim is built on the allegation that 1,345 trains passed the work site. But it admits that only 90 of these trains passed on the north bound side between 8:00 a.m. and 12:00 p.m. (Findings 42, 46). In other words, the plain language of the contract and the third-party delay rule bar the claim with respect to 1,255 of the trains, or more than 93% of the total.

*Elements of a Constructive Acceleration Claim*

The Changes Clause grants a contractor the right to seek an equitable adjustment when a change is made to the contract (finding 5). A constructive change occurs when the contract is changed "either due to an informal order from, or through the fault of, the government" rather than through a formal change order. *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016) (quoting *NavCom Def. Elec., Inc. v. England*, 53 Fed. App'x 897, 900 (Fed. Cir. 2002)). A constructive acceleration occurs when the government requires the contractor to adhere to the contract's original performance deadline even though the

32

contract provides the contractor with periods of excusable delay entitling the contractor to a longer performance period. *Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). To prevail on a constructive acceleration claim, a contractor must demonstrate that:

> (1)     the contractor encountered a delay excusable under the contract;
>
> (2)     the contractor made a timely and sufficient request for an extension of the contract schedule;
>
> (3)     the government denied the contractor's request for an extension or failed to act on the request within a reasonable amount of time;
>
> (4)     the government insisted on completion of the contract within a shorter period than the contractor would have been entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change to the contract; and
>
> (5)     the contractor was required to expend additional resources to compensate for the lost time and remain on schedule.

*Id.* Because Boland is unable to demonstrate any of these elements, we hold that it has failed to present a prima facie case of constructive acceleration.

*Boland Has Failed to Demonstrate That the Delays Were Excusable*

Boland argues that the track time delays it and Target experienced during the project were excusable under the contract (app. br. at 33-35; app. reply at 2-13). The Default clause provides that the contract is not subject to termination for default where "[t]he delay in completing the work arises from *unforeseeable causes beyond the control and without the fault or negligence of the Contractor*" (finding 6) (emphasis added). Boland asserts that the track time delays "were unforeseeable and without the fault or negligence of [Boland and Target]" and "were so extensive and unreasonable that they far exceeded the contractor's expectations for review of the Contract and conducting a prebid site visit," and were thus excusable (app. br. at 33-34).

A delay foreseeable to a contractor is not excusable. *See Fraser*, 384 F.3d at 1364-65 (Fed. Cir. 2004) (finding that delays to project were not excusable due to

33

foreseeability of need for overtopping of contractor's dike design); (*see also* finding 6 (the Default clause)). This solicitation included several provisions relating to work adjacent to a railroad right-of-way, and the protections that would be necessary during performance by any successful contractor (findings 12-19). Amendments to the solicitation reminded bidders it should pay special attention to the specific requirements dealing with the railroad right-of-way, and "expect 10-15 work stoppages per day."(finding 15). Bidders were notified that they would "assume all lability for any and all damages to its work . . . caused by railroad traffic" (finding 19). Numerous references informed bidders of the steps necessary to protect railroad property (findings 12-14, 18). Flagging services[4] for this project were required for protection of the railroad's operations "whenever the contractor's personnel or equipment are . . . working on the Railroad's right-of-way, or across, over, adjacent to, or under a track, or when such work has disturbed or is likely to disturb a railroad structure . . ." Bidders were required to "arrange and conduct" their work to not interfere with the railroad. In fact, it was clearly set out in the contract that authorized railroad employees had the right to stop any contractor activity if that activity could cause danger to the railroad. In addition, the railroad retained the right to utilize all its right-of-way property for its railroad operations (finding 14).

Boland and Target were on notice before bidding on the contract that the worksite was adjacent to railroad tracks and that work would have to be halted when trains passed through the worksite (findings 3, 15-16, 18-19). Specifically, Sections 12 and 13 of the "Special Provisions for Protection of Railway Interests" provided in part:

> 12. GUIDELINES FOR PERSONNEL ON RAILROAD
> RIGHT-OF-WAY
>
> . . . .
>
> E. All welders and cutting torches working within 25' of
> track must stop when train is passing.

---

[4] The contractor was responsible for paying the railroad for all costs of flagging services at a rate of $650 per day (R4, tab 10 at GOV000095-000097). In the event that a flagman assigned to the project site, was called away for an emergency elsewhere, the contractor was required to delay its work until the flagman was available again. "Any additional costs resulting from such delay shall be borne by the Contractor . . . ." (R4, tab 10 at GOV000097)

13. GUIDELINES FOR EQUIPMENT ON RAILROAD
RIGHT-OF-WAY

. . . .

D. All cranes and boom equipment under load will stop
work while train is passing (including pile driving).

E. Swinging loads must be secured to prevent movement
while train is passing.

. . . .

J. All operating equipment within 25' of track must halt
operations when a train is passing. All other operating
equipment may be halted by the
flagman if the flagman views the operation to be dangerous
to the passing train.

(finding 18)

The specifications further stipulated:

No charge or claim of the Contractor against either the
Corps or the Railroad will be allowed for hindrance or
delay on account of railway traffic; any work done by the
Railroad or other delay incident to or necessary for safe
maintenance of railway traffic or for any delays due to
compliance with these special provisions.

(finding 19) Boland was notified on multiple occasions, including during the pre-bid site visit[5]—with both Boland and Target representatives in attendance—that 10 to 15 trains would pass through the worksite on average during a 24-hour period and that there would be 10 to 15 work stoppages (findings 15, 20). Inexplicably, Target was unaware of this and has contended that an entire workday was lost if six trains passed through the worksite (findings 15, 20, 36, 38).

The language used to identify the interferences likely to be encountered from a functioning railway were undeniably clear. Every aspect of working alongside a

---

[5] "It is well-settled that a contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1346 (Fed. Cir. 1998).

railroad right-of-way could be found in the materials provided to offerors prior to bid. Boland even acknowledged in its work plan that any track time outside the work window or on the southbound track was purely based upon the needs of the railroad. It was always known that there would be times that work could not be performed. (finding 16) Amendment 5 to the solicitation told contractors to "expect 10-15 work stoppages per day (finding 15). The expectation of 10-15 work stoppages was reinforced during the pre-bid site inspection (finding 20). Boland even identified in its Railroad Protection Liability Application that it expected to encounter 15 trains per day (finding 22).

Any interference caused by passing trains should not have been a surprise to either Boland or Target. The passing of trains outside the work-windows, were not unreasonable considering all of the notices provided. The site visit and the solicitation could not be clearer on the likely impacts that could occur from railroad operations, and the responsibilities being imposed upon the contractor when they were preforming this work. The track time delays to this project were foreseeable and the contractor cannot now be allowed to rely on ignorance or a lack of understanding of the impact working on a railroad right-of-way might have. This work was to be performed as required by the contract, and necessitated consideration of these provisions by the contractor prior to bid. The language used and the extent of the notifications made any delay to the contractor's work caused by train traffic not in the work window to be reasonably foreseeable.

Even assuming *arguendo* that the track time delays were not foreseeable, Boland has failed to prove that the delays to the project were attributable to train traffic. "[I]t is generally recognized that a contractor is not entitled to a time extension upon the mere occurrence of an event. The contractor must show that the event caused delay to the overall completion of the project and must establish the number of days of relief to which it is entitled." *Phillips Nat'l, Inc.*, ASBCA No. 53241, 04-1 BCA ¶ 32,567 at 161,102 (citations omitted). We know that "[a] contractor seeking to prove the government's liability for a delay has the burden of proving the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in the contractor's performance, and the alleged harm to the contractor for the delay." *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316 (Fed. Cir. 2000). To establish that "causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract." 226 F.3d at 1317. Regarding concurrent delays, the general rule is that "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984) (quoting *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982)). The Board "will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." *Id.*

By Boland's own admission, Target itself was largely responsible for these delays. Correspondence between Boland and Target reveals that Target experienced numerous delays unrelated to train traffic, such as equipment-, weather-, and personnel-related issues throughout the course of the project (findings 47, 51, 54, 56-57, 59, 61, 64-66, 69). Target's failures on this project began as early as June 2010, and continued throughout. Target's first omission occurred when it failed to provide submittals as required by their subcontract with Boland. Boland maintains that Target delayed the project by seven days. (finding 47) One of the principal drivers hindering the work was the equipment problems that plagued Target throughout the project. Target's equipment had alignment problems, causing them to pull pile segments out of the ground and redrive them. They eventually replaced the RG19T with a conventional vibrating hammer and crane. Problems persisted with the Mantiowoc Crane which was intended to be used to drive H-piles (finding 64). Other equipment issues surfaced, including the failure to have demolition equipment on site, the use of undersized rigging, and continuous equipment problems (finding 53). Boland expressed concern that Target was "failing miserably" regarding pile driving (finding 56) and determined that Target had failed "to fully utilize the currently allotted track time" and was "behind schedule due to circumstances within Target's control" (finding 65).

The Daily Construction Reports prepared by Boland also identified a plethora of issues with Target's performance unrelated to train traffic (finding 53). Target suffered performance issues because of staffing, scheduling, and management issues (findings 54, 58-59, 65-66). It failed to schedule the pickup of materials, and in early October 2010, Target had not yet hired a pile crew for the project (finding 53). Meanwhile, Target struggled with hiring workers who were familiar with the process of driving sheet pile (finding 55). Personnel issues continued to beset Target well into March 2011 (findings 55, 78). Workmanship issues required Target to perform rework (finding 53). And, for the period of three months (January to March 2011), when Target was authorized by the railroad to continue pile driving while trains were passing through the worksite, they continued to experience issues affecting their ability to make progress. (findings 66-72, 75, 77, 78). These delays to the project were so extensive that Boland itself issued a cure notice to Target (finding 70). While Target challenged Boland on the causes of the delay, their finger-pointing settles in on contractor issues such as schedule sequencing or impacts, road closures, and issues that were previously settled by Boland with the government (findings 72, 75, 80-81). And while Boland points to anecdotal evidence of days when more than nine trains passed through the worksite (app. br. at 12; finding 37), Boland was on notice that any track time outside the work window of 8:00 a.m. to 12:00 p.m. or on the southbound track would be "given by the Railroad purely based upon the needs of the Railroad" (findings 15-16). Furthermore, Target's TRACK LOG identified 1,345 trains that passed through the worksite throughout the 269-day claim period during working hours—an average of exactly five trains per workday (finding 46). A number far less

than what the government told bidders to expect (finding 15). Even if the contractor was able to establish a causal link between the government's wrongful acts and the delay in the contractor's performance, Boland still cannot recover for what would be concurrent delay, such as the substantial performance problems experienced by Target (findings 47-48, 51-59, 64-67); *see Sauer, Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000); *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000); *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct. Cl. 639, 649-50 (1976). Notwithstanding Boland's assertions in this appeal, we hold that the weight of the evidence establishes that many of the issues were concurrent with delays that may be attributable to train traffic.

Neither does Target attribute its delay to any of the issues it experienced with its own subcontractors. Target's President admits in a lawsuit filed against its own subcontractor Barcelona, that Target was forced to accelerate the sheet pile-driving work on the 105 project, working an additional 110 days and incurring an additional $3 million in excess costs, as a direct result of the equipment problems it suffered with the RG19T (findings 85, 87). Nor do they attribute any of the delay claimed on this project (LPV 105.02) to their subcontractor Vice Construction. In Target's lawsuit against Vice, they claim that Target suffered delay and increased costs because the pile driving equipment supplied by Vice was inadequate (finding 86). Neither Boland nor Target made any attempt to segregate out these delays from the delays it claims were caused by passing trains.

Even assuming appellant was able to move past these countless issues, the evidence contained in the pile logs largely refutes the claim. Boland hired a contractor to prepare pile logs for this project, collecting data on every pile including pile number, location, date, weather, start time, finish time, hits per foot, etc. The information was collected as the work was being performed and was provided to the government. (finding 107) The pile logs are the most reliable evidence as to what work actually occurred and the timing of that work. This evidence is instrumental in examining the assertions made by appellant in its claim, and how it comports with the data collected in the pile logs during the performance of the contract. Our examination revealed a multitude of claims that are not supported by the pile logs, and in fact, conflict with specific allegations made by appellant.

Appellant's claim of train delays on September 11, 2010, during certain hours shows that work was occurring on Monolith 213, at Pile Nos. 8 and 10. These piles were being driven during the exact time Target claims it had to stop work because of train no. 130. The pile log also revealed that the work on September 11, 2010, was stopped at 6:50 p.m. because of equipment issues. After almost 2 full days of delay because of failures to the equipment, the new hammer was installed on September 13, 2010, with work resuming at 3:45 p.m. (finding 111) Ironically, Target claims that it had to stop work on September 13 at 4:53 pm because of passing trains, but the pile

38

log reveals that work was ongoing at Monolith 214, Pile No. 1 between 4:42 p.m. and 5:12 p.m. (finding 112) On September 16, 2010, Target claims it was delayed by three passing trains beginning at 4:10 p.m. and lasting 3 hours and 15 minutes. The pile log reveals that work continued at Monolith 214 at Pile Nos. 6, 7, 14, 16 covering the same period Target alleged it was delayed (finding 113). On October 9, 2010, Target alleges they were delayed during two different time periods. Instead, the logs show piles being driven during precisely the same time periods that Target claims they were shut down because of train traffic (findings114-15). There were several dates that Target claimed they were shut out of work for an entire day because there were more than nine trains passing through the site. But our review revealed that the pile log[6] refutes the alleged delay on each of the dates identified (findings 107-116). At best, our comparison between the claim and the pile logs, reveal the imprecisions with which appellant put together the claim. The evidence contained in the pile logs is insurmountable in evaluating the validity of appellant's claims of delay caused by train traffic.

While we don't want to belabor the obstacles surrounding this claim, the contract drawings also provide an impediment to some of the claims presented by appellant. The drawings provide insight into whether passing trains could impact the progress of work on certain Monoliths. While there were claims of railroad delay relating to Monoliths 175 through 180 and Monoliths 222 through 227, the drawings show that the location of these Monoliths were not in or near the railroad right-of-way (findings 109-10). The abundance of contradictory evidence can lead us to only one conclusion—Target's delays resulting from passing trains is lacking in support, and any delay suffered by Target was due to its own fault. Accordingly, the abundance of the reliable evidence supports the conclusion that appellant is responsible for any increased costs associated with completing this project on time.

Notwithstanding the unequivocal language putting bidders on notice of the impacts of working alongside a railroad right-of-way, the government can be held to account for delay were passing trains interfered with performance occurring during the work window of 8 a.m. to 12 p.m. on the northbound track. There is reliable evidence of 90 trains that traveled on the northbound track during the work window -- although the government made clear that no work stoppages were to occur during this work window (findings 15, 46). While we recognize the challenges made by the government to the compilation of Target's Track Log we conclude that the testimony of Mr. Fulmer establishes the reliability of this document and the underlying data (finding 46). Unfortunately, appellant has not taken the next step of showing that the 90 trains that passed on the north bound track during the work window interfered with Target's work causing delay. In order to recover for a claimed delay, appellant has the

---

[6] The quality control reports also refute the alleged delay on each of the dates identified (finding 39).

burden to establish that the government delayed the ultimate project completion. *Phillips Nat'l, Inc.*, 04-1 BCA ¶ 32,567 at 161,102 (citations omitted). In construction cases, appellant would typically demonstrate a delay to project completion through a CPM schedule analysis. *Nassar Group Int'l,* ASBCA No. 58451, 19-1 BCA ¶37,405 at 181,833; *In re Galaxy Builders, Inc.,* ASBCA Nos. 50136, 50018, 00-2 BCA ¶31,040 at 153,282. Although this contract required the use of the critical path method to prepare project schedules for use in evaluating progress, there has been no demonstration by appellant that the actual incidents of a train passing during the work window on the north bound track impacted the critical path[7] (finding 10) Additionally, appellant has done nothing to account for its frequent and documented concurrent delays. Because Boland has "not established its delay apart from that attributable to the government," neither can recover damages. *Klingensmith*, 731 F.2d at 809. The Board "will deny recovery where the delays are concurrent, and the contractor has not established its delay apart from that attributable to the government." *Id*.

*Boland Has Failed to Demonstrate That it Requested an Extension of Time*

Boland contends that it requested an extension of time for the project by forwarding Target's February 17, 2011 REA to USACE and that USACE never responded to nor granted this request (app. br. at 20; app reply at 13-15; *see also* findings 60, 64-65). We disagree. In its February 28, 2011 correspondence to USACE, Boland merely attached Target's February 17 letter and stated that Target had notified Boland that it would seek an equitable adjustment due to "unreasonable and excessive delays" caused by passing trains (findings 75-76). The letter further advised USACE to "review the attached letter from Target, dated 17 February 2011, which outlines their position and contact [Mr. Whitworth] should you have any questions regarding this matter" (*id.*). Since no privity of contract existed between Target and USACE, any valid request for a time extension would have had to be made by Boland, not Target. While not required, contractors seeking a time extension for an excusable delay regularly request a specific time frame to mitigate the impacts of the delay. *Zafer*, 833 F.3d at 1363. At no point in this transmission did Boland ask USACE for a time extension, nor did Boland or Target specify the period desired for a time extension (*see id.*; findings 70, 75). In fact, by Mr. Boland's own admission, Boland "did not request a specific extension of time" (finding 76). Conversely, when Boland requested a time extension to ameliorate impacts to the project caused by road closures, Boland explicitly asked for an extension of 60 days (finding 80).

---

[7] Nor does appellant attempt to explain how Target was delayed by train traffic for the three-month period (January 2011 until March 21, 2011) that Target was allowed by the Railroad to continue driving piles while trains were passing on the track. (finding 78).

Accordingly, because Boland never requested a time extension USACE never denied nor failed to timely act upon any such request.

*USACE Did Not Directly or Indirectly Order Boland to Accelerate*

Boland alleges that USACE directly ordered it to accelerate the project to overcome the delays to the project to meet the deadline via issuance of Mr. Rossignol's February 16, 2011 letter advising Boland to "take all necessary steps" to meet the deadline, and, in the alternative, that USACE's course of action during the project constituted an implied order to accelerate (app. br. at 35-39; app. reply br. at 13; finding 69). However, as USACE argues, and we agree, Mr. Rossignol's letter was merely a directive that Boland get back on schedule after its self-imposed and admitted delay causing them to fall behind on the project (gov't sur-reply at 12-13; findings 47, 49, 52, 54, 56, 58-59, 61). The contract provided:

> If, in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including those that may be required by the Contracting Officer, without additional cost to the Government. In this circumstance, the Contracting Officer may require the Contractor to increase the number of shifts, overtime operations, days of work, and/or the amount of construction plant, and to submit for approval any supplementary schedule or schedules in chart form as the Contracting Officer deems necessary to demonstrate how the approved rate of progress will be regained.

(finding 7) Furthermore, while an expression of concern about progress coupled with a refusal to issue extensions can amount to an order to accelerate, "[s]uch expressions do not always constitute the equivalent of orders to accelerate . . . particularly if the expression comes before the time when the contractor has raised a specific and valid claim of right to an extension." *Fraser*, 384 F.3d at 1367. Mr. Rossignol's February 16 letter was sent to Boland twelve days before Boland forwarded Target's February 28 letter complaining about the train traffic to USACE (findings 69, 75). While Boland points to the immutability of the HYLA deadline as evidence that any request for a time extension would have been denied (app. reply at 14-15), USACE granted several time extensions for delays caused by weather and road closures over the course of the project (findings 81-82, 84). Accordingly, we conclude that USACE neither implicitly nor explicitly directed Boland to accelerate. *Fraser*, 384 F.3d at 1367.

41

*Boland Has Failed to Adequately Demonstrate That it and Target Expended Additional Resources*

Boland contends that it and Target expended additional manpower, equipment, and funds in response to USACE's "order to accelerate" (app. br. at 39). USACE counters that Boland and Target have failed to establish that they expended any additional resources due to the claimed delays (gov't reply br. at 28-30). Boland's revised REA utilized a modified total cost methodology to quantify the alleged costs it incurred as a result of passing trains (finding 100). The Board does not favor the total cost method of recovery, and it will not be used if there is another, more reliable method available to establish the contractor's alleged damages. *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1383 (Fed. Cir. 2004); *Raytheon Co. v. White*, 305 F.3d 1354, 1365 (Fed. Cir. 2002). Nevertheless, the hearing in these appeals was on entitlement only, leaving the issue of quantum, if necessary to another day.

Furthermore, as we found above there was ample evidence to conclude that any losses and delay suffered by Target were the direct result of the continuous self-inflicted difficulties encountered with equipment, personal and their own subcontractors (findings 54, 58-59, 65, 85-86). A contractor seeking entitlement to delay damages "must establish the extent of the delay, the contractor's harm resulting from the delay, and the causal link between the government's wrongful acts and the delay." *Essex Electro Eng'rs, Inc*., 224 F.3d at 1295; *see also States Roofing Corp.*, ASBCA No. 54680 *et al.*, 10-1 BCA ¶ 34,356 at 169,661 (citing *Essex Electro*). Boland alleges that on average, each train that passed through the worksite delayed the project by 1.05 hours (findings 36, 38). However, neither Boland nor Target have adequately demonstrated how they arrived at this number, nor have either presented a critical path analysis or similar methodology by which the Board can reasonably ascertain the extent of the alleged track time delays or demonstrated the impracticability of utilizing such methods. *See, e.g.*, *Southwest Marine, Inc.*, ASBCA No. 36854, 95-1 BCA ¶ 27,601 at 137,520 (denying claim where "[a]ppellant provided no critical path information, [n]or made any effort to show how the alleged delays impacted the overall job completion date."). As we have already determined, Boland and Target's delays to the project are not excusable. The lack of evidence in support of the allegations is sufficient basis upon which to deny the appeal. Appellant has simply not proven that it is entitled to be compensated by the government for any delay associated with the passing of trains. Accordingly, we conclude that Boland has failed to meet its burden of establishing that it expended additional resources due to the alleged track time delays.

<u>CONCLUSION</u>

For the foregoing reasons, the appeals are denied.

Dated: September 20, 2024

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59313, 60294, Appeals of David Boland, Inc., rendered in conformance with the Board's Charter.

Dated: September 20, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals